[No. D015916. Fourth Dist., Div. One. Jan. 20, 1993.]

CHRISTWARD MINISTRY, Plaintiff and Appellant, v.
COUNTY OF SAN DIEGO et al., Defendants and Respondents;
NORTH COUNTY RESOURCE RECOVERY ASSOCIATES, Intervener
and Respondent.

**COUNSEL**

Gray, Cary, Ames & Frye and Michael M. Hogan for Plaintiff and Appellant.

Lloyd M. Harmon, Jr., County Counsel, Diane Bardsley, Chief Deputy County Counsel, and Mark C. Mead for Defendants and Respondents.

Pillsbury, Madison & Sutro, Ronald E. Van Buskirk, Walter R. Allan, Sharon M. Solomon and David S. Winton for Intervener and Respondent.

---

## Opinion

**TODD, Acting P. J.**—Christward Ministry (Christward), a nonprofit corporation owning 640 acres of land located to the east of the San Marcos Landfill (Landfill), appeals a judgment entered upon Christward's petition for a writ of mandate challenging the adequacy of an environmental impact report (EIR) prepared by the County of San Diego (County) in connection with a planned vertical and horizontal expansion of the Landfill. The trial court granted the petition in some respects and Christward appeals only from portions of the judgment (a) finding the EIR was adequate with respect to the project description, its cumulative impact analysis and its analysis of the impacts on established religious practices in the area; (2) finding the mitigation monitoring plan needed only to identify who is responsible for its implementation; and (3) denying attorney fees to Christward.

Finding Christward's contentions and arguments do not present a basis for reversal, we affirm.

### Facts

On Christward's 640 acres located approximately 1.6 miles to the east of the eastern boundary of the Landfill, Christward operates Questhaven Retreat. Christward's president, Stephen Isaac, describes Questhaven as a "wilderness sanctuary for the experience of God-in-nature," a key element of which "is the uplift of the panoramic view offered to the visitor or retreatant." According to Isaac, the retreat has a most frequented nature trail leading to a large cross on a ridge at a 940-foot elevation and then a descending westerly trail overlooking the Landfill and along which "our finest and most awe-inspiring views of the Pacific Ocean are to be seen."

The proposed expansion of County's Landfill involves raising the current elevation of the site's surface by 200 feet to a height of 950 feet above mean sea level (msl) as well as increasing the site's horizontal dimensions both to the north and to the south. When County's board of supervisors (Board) accepted and certified that the EIR for the Landfill expansion complies with the California Environmental Quality Act (CEQA) (Pub. Resources Code,

§ 21000 et seq.)[1] it directed the chief administrative officer (CAO), among other things, to return to the Board within a year of the Landfill reaching 850 feet for a policy decision on whether the County would go over the 850-foot height, and not to exceed that height until action by the Board. The Board also directed that at the time the matter of upward expansion is brought back it would again consider the question of closure of the Landfill if there is another landfill in operation in North San Diego County (North County) at that time.

North County Resource Recovery Associates (NCRRA) is a privately owned joint venture of two California corporations, which intervened in this action and has filed a respondent's brief on this appeal. Since 1982, NCRRA has been under contract with the County to design, construct, own and operate a resource recovery and recycling facility on the western 15 acres of the Landfill site in order to provide solid waste disposal service to the County. NCRRA had pending amendments to its contract with the County and a connected supplemental EIR, which could be adversely affected by a decision in favor of Christward.

County owns and operates the Landfill under a use permit from the City of San Marcos. The Landfill serves the cities and unincorporated area in the northwest part of San Diego County. It has been the only operating landfill in North County since 1985 and is nearing capacity. A new landfill in North County will not be opened before 1994. The final EIR for the project in question states that without this expansion the waste generated in the San Marcos service area after 1991 would have to be disposed of outside the area until a new North County landfill is operating. Additional emissions into the air from vehicles hauling trash to either of the two other landfill sites in the county would triple or quadruple, depending on which of the sites is used. Hauling costs would also increase.

With the expansion the Landfill would increase its remaining capacity by approximately 8 million tons, from 2.8 million tons (4.65 million cubic yards) to 10.84 million tons (18.06 million cubic yards). A reduction of the height of the proposed expansion from 950 feet to 850 feet would reduce its capacity to 4.8 millions tons, down 3.2 million tons, and would cause the Landfill to reach capacity in 7 years, rather than 11 years.

On June 12, 1990, the County completed a draft EIR for the proposed Landfill expansion, after which the EIR was circulated for review and

---

[1]All statutory references are to the Public Resources Code unless otherwise specified.

References to "Guidelines" are to the state CEQA Guidelines which implement the provisions of CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.)

comment. The final EIR, including comments of concerned citizens and experts, responses to the comments, and revisions of the draft EIR, was completed October 1, 1990. The EIR found the expansion will cause significant adverse environmental effects on the project area's geology, hydrology, biological resources, transportation and circulation, air quality, land use, aesthetics, visual resources, acoustics and fire protection.

The County held public hearings on October 23, and November 13, 1990. After the last hearing, the County certified the EIR as complying with CEQA, adopted mitigation measures, approved a mitigation monitoring plan and directed staff to acquire additional surrounding properties to increase the size of the buffer zone. The County also directed the CAO to report back within a year of when the expansion would reach the 850-foot above msl elevation at which time it would determine whether to go ahead with the expansion to 950 feet and also consider whether to close the Landfill if there were another North County landfill in operation at the time. On the same date, the County filed a notice of determination (§ 21152) stating its determinations the project will have a significant effect on the environment; an EIR was prepared for the project pursuant to CEQA; mitigation measures were made a condition of approval of the project; and a statement of overriding considerations was adopted for the project.

On December 13, 1990, Christward commenced this proceeding in mandate and, alternatively, for an injunction. After a hearing in July 1991, the trial court granted the petition in part, finding "the significant defect in this EIR is the failure to adequately address the issue of water quality," and that the mitigation monitoring plan accompanying the EIR is deficient in failing to contain information "which would assure the decision makers that a mitigation program would be carried out successfully."

With respect to Christward's contentions concerning the project description, the court stated in part:

"The CEQA Guidelines at Section 15130 require that the EIR:

"1) Have an accurate project description; and

"2) Consider the cumulative impacts of other related projects.

"Neither CEQA nor *City of Santee* v. *County of San Diego* (1989) 214 Cal.App.3d 1438 [263 Cal.Rptr. 340] require that a single EIR be prepared an[d] include *all* of the proposed North County trash projects. Although this EIR discusses other trash projects in the North County (A.R. 696-703), it

does not contain an assessment of the cumulative impacts of this project taken together with those other projects.

"Although a County wide EIR is not required, this EIR should arguably have taken into account what effect, if any, the other solid waste projects will have on this expansion."

With respect to Christward's contention the EIR was deficient because it contained no reference to the potential significant impact of the proposed expansion on Christward's use of its property as a religious retreat, the court pointed out that appendix G of the Guidelines, in subdivision (w), provides that a project will have significant effect on the environment if it conflicts with established religious uses in the area. The court found that the specific religious practices of Christward were not identified for the County by Christward in the preparation of the EIR; Christward only expressed a concern for obstruction of its panoramic view of the Pacific Ocean by the vertical expansion of the Landfill; the EIR did address the view obstruction and found the impact would be significant and not mitigable; and the County adopted a statement of overriding considerations for this impact. The court held it was incumbent on Christward, during the immediate environmental review process rather than based on presumed knowledge from previous lawsuits, "to specifically identify for the County which of [its] religious practices would be impacted by this expansion. The County could then have made the appropriate analysis."

The court entered a judgment based on these and other findings. The County reanalyzed the water impacts and prepared a supplemental EIR, along with providing additional information to correct the defect in the mitigation monitoring program by identifying who is responsible for ensuring that the County implements each mitigation measure. In December 1991, the County filed its return to the peremptory writ describing its compliance with the judgment.

After the judgment was entered in October 1991, Christward filed a notice of motion for attorney fees under Code of Civil Procedure section 1021.5. The trial court denied the motion and this appeal followed.

DISCUSSION

■ The 1990 case of *Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 563-564 [276 Cal.Rptr. 410, 801 P.2d 1161], summarizes the purposes of CEQA and our task of reviewing the County's action under CEQA as follows:

"As we recently observed in *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*): 'The foremost principle under CEQA is that the Legislature intended the act "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." ' (*Id.* at p. 390, quoting *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].)

■ "The EIR has been aptly described as the 'heart of CEQA.' (Guidelines, § 15003, subd. (a); *Laurel Heights, supra,* 47 Cal.3d at p. 392; *County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377].) Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made. Thus, the EIR 'protects not only the environment but also informed self-government.' (*Laurel Heights, supra,* 47 Cal.3d at p. 392.)

■ "In reviewing agency actions under CEQA, Public Resources Code section 21168.5 provides that a court's inquiry 'shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' Thus, the reviewing court ' "does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document." ' (*Laurel Heights, supra,* 47 Cal.3d at p. 392, quoting *County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 189 [108 Cal.Rptr. 377].) We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. 'Our limited function is consistent with the principle that "The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations." ' (47 Cal.3d at p. 393, quoting *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283 [118 Cal.Rptr. 249, 529 P.2d 1017].) We may not, in sum, substitute our judgment for that of the people and their local representatives. We can and must, however, scrupulously enforce all legislatively mandated CEQA requirements." (Fn. deleted.) We conduct this review with these precepts in mind.

I

Christward contends the judgment should be reversed because it shifts the duty of ensuring adequate environmental review from the public agency to private citizens. In this connection Christward argues that in its order granting the petition for a writ of mandate, except with respect to its

contentions there was an inadequate analysis of the project's impact upon established religious practices and inadequate analysis of alternatives to the proposed project, the court appeared to agree with its assertions the EIR had an inadequate project description along with the water impact and mitigation monitoring contentions. Christward notes the judgment was considerably narrower, only including the latter two aspects concerning the water analysis and responsibility for mitigation monitoring. Thus, Christward argues, the narrow scope of the judgment "is clearly contrary to the legislative intent that CEQA afford the fullest possible protection to the environment. Pub. Res. Code §§ 21000, 21001 [both declaring legislative intent]; *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259-260 [104 Cal.Rptr. 761, 502 P.2d 1049] [interpreting 'project' in CEQA to include private activities for which a government permit or other entitlement for use is required]." Christward also argues that if the judgment is allowed to stand, it would "turn CEQA on its head by effectively shifting the duty to ensure preparation of an adequate EIR from the public agency to private citizens." For the latter proposition, Christward cites cases holding that an EIR must itself discuss and analyze feasible alternatives to the proposed project and is not sufficient if it only contains the agency's bare conclusions or opinions about the alternatives. (See, e.g., *Citizens of Goleta Valley, supra,* 52 Cal.3d at pp. 568-569.) Christward also argues the denial of its application for attorney fees "effectively doubled" its burden.

 While these contentions may have been intended only to set the stage for the more detailed assertions that follow,[2] we briefly treat Christward's claims about the variance between the order and the judgment and burden shifting. The record does not support the contention that there was such a variance. The court's statement the EIR should "arguably" have taken into account what effect other solid waste projects will have on this expansion does not constitute a finding by the court the EIR was defective for not having done so. Moreover, the EIR does discuss other trash projects in the North County; and in section 3.3 of its project description section dealing with projected site life and landfill capacity, the EIR does take into account what effect other solid waste projects will have on the Landfill expansion. Referring to the other North County trash projects, the EIR states, "These projects are being processed through the appropriate state and local agencies, regardless of the proposed landfill expansion, and are not dependent on the landfill expansion." From the discussion in the EIR, and particularly statements referring to capacity analyses based on population projections and identification of three alternative North County sites for a new landfill, it is clear that these independent new landfill operations would not be operational

---

[2]Christward concludes the section of its brief making these assertions with the request, "the judgment should be reversed, in part, for the reasons set forth below."

until sometime after January 1994, at the earliest. The EIR analyzes and discusses the effects on the proposed Landfill expansion of a new North County landfill and other waste projects. Due to the independent and presently unsettled nature of these other proposed landfill sites, as compared to the apparent immediate implementation possibilities of the Landfill expansion here at issue, the discussion in the EIR adequately covered the additional possibilities. The additional possibilities for a new landfill in North County were not being discussed and analyzed as alternatives to the Landfill,[3] but the effect of such a landfill was discussed in the EIR. The EIR gave adequate consideration to the effects of the other solid waste projects on the proposed Landfill expansion in question.

■ In any event, nothing in the trial court's order amounted to a finding of inadequacy in the EIR or effectively shifted the burden of preparing an adequate EIR from the County to private citizens. Moreover, even if we were to construe the court's order as a finding of inadequacy, the situation here was analogous to a situation in which there is a divergence between the statement of intended decision and the judgment, where the rule is that the court is not bound by its statement of intended decision and may, on noticed motion, enter a wholly different judgment than that announced. (*Canal-Randolph Anaheim, Inc.* v. *Wilkoski* (1978) 78 Cal.App.3d 477, 494 [144 Cal.Rptr. 474].) The parties here could not agree on a proposed judgment, and each side submitted a form of judgment reflecting its interpretation of the order. The court signed the version prepared by the County, making no order with respect to any inadequacy of the EIR's project description in terms of the impacts considered with other solid waste projects. The latter process is analogous to the noticed motion procedure to which the *Canal-Randolph* rule applies, and thus we apply the rule here.

## II

Section 3 of the EIR is entitled "Project Description." The introductory paragraph of section 3 reads:

"The County of San Diego Public Works Department is proposing to increase the capacity of the San Marcos Landfill to ensure continued solid waste disposal capabilities in the northwestern portion of San Diego County. As described in detail below, the expansion proposal includes two elements: (1) raising the maximum elevation for permitted fill from 750 feet above mean sea level (msl) to 950 feet above msl and (2) expanding the property boundaries of the landfill site to include an additional 136 acres (from 205 to

---

[3]There is no contention in this case that the EIR does not adequately analyze and discuss alternatives to the Landfill expansion project as required by CEQA. (§§ 21001, subd. (g), 21002.1, subd. (a), 21061; see *Citizens of Goleta Valley, supra,* 52 Cal.3d at pp. 564-565.) Indeed, there is a substantial section in the EIR on alternatives.

341 acres, as shown on Exhibit 3-1). The County would remain the owner and operator of the landfill."

Section 3 of the October 1, 1990, EIR continues to describe additional aspects of the expansion project, among other things noting the Landfill will reach capacity in 1991 and:

"Although the County is currently evaluating alternatives for a new North County Landfill (discussed in Section 2), the most optimistic projections do not expect operation of a new landfill before January 1994. Without this expansion, the waste generated in the San Marcos service area after 1991 would have to be disposed of outside the area until a new North County Landfill is operating. Most likely, waste would be trucked to Sycamore Landfill (Exhibit 2-8). As discussed below in Section 3.3, the County would continue to operate the expanded San Marcos Landfill after a new North County Landfill is in use. The County is seeking to extend the site life with the proposed project by developing a technically safe, cost-effective solid waste disposal facility."

Under the heading "Projected Site Life and Landfill Capacity," in section 3.3, the relationship of the Landfill and other solid waste processing aspects is examined as follows:

"The expected closure date of the expanded landfill could vary depending on a number of factors. Changes in waste generation rates and population growth will affect the amount of waste generated in the service area. Factors affecting the amount of waste actually deposited in the landfill include the availability of other landfills, development of alternative waste disposal technologies, recycling programs, variations in the economy, and improvements in consumer packaging. Increases in landfill tipping fees, hours of operation, the length of time spent in waiting lines, and road construction and improvements can also influence the amount of waste to reach the landfill.

"For San Marcos Landfill, specific factors that would change the life of the landfill include the planned WTE [Waste To Energy] plant, the County's recycling programs, and the proposed new North County Landfill. The assumptions used in this report are listed below.

"[1] The WTE facility is predicted to be operational in 1994.

"[2] The new North County Landfill is projected to be fully permitted and ready to open in January 1994. If the distant Blue Canyon site were selected, it is further assumed that the new fill would open as soon as possible, diverting from San Marcos roughly 6 percent of the north county waste stream. The remaining 94 percent of the waste stream would continue to be

placed at the San Marcos Landfill. If, however, one of the other sites (Gregory Canyon or Aspen Road) were selected, the new landfill would be assumed not to open until San Marcos is closed; no waste would be assumed to be diverted from San Marcos during its life and there would be no effect on San Marcos Landfill.

"[3] The County is committed to meeting its goal of reducing the total waste stream by 30 percent by 1992. Recycled materials would include aluminum, yard waste, paper, plastics, and ferrous materials; the specific quantities of each project have not been determined.

"[4] The County would increase its recycling and source reduction efforts to meet the state mandated goal of a 50 percent reduction in the landfilled waste stream by 2000.

"[5] The total waste stream is increased by 5 percent annually; that is the equivalent of a 5 percent annual population increase with a stable per capita waste generation rate.

"Exhibit 3-2 shows the predicted life of the landfill under various assumptions. Life span scenarios for the expanded San Marcos Landfill range from 6 years (closing in FY 1997/1998) to 15 years (closing in FY 2005/2006). The County's preferred scenarios would be those that assume the WTE facility is operating in 1994, and recycling goals are met (Scenarios 6 and 8). The County also assumes that the new North County Landfill is fully permitted and ready to operate by January 1994. Thus, the County's preferred scenario would result in an increased life span of as much as 15 years for the expanded San Marcos Landfill, with closure anticipated to occur in FY 2005/2006."

Christward contends the description of the "project" evaluated in the EIR is inadequate, causing piecemeal environmental review and inadequate analysis of the cumulative impacts of the project. ▮ We have already concluded in part I, *ante*, that there is no inadequacy in the EIR's project description in terms of the impacts of the project considered with other solid waste projects since it discusses and analyzes other proposed and existing solid waste projects which are independent of, not alternatives to, the Landfill in question, and the effects of the other projects on the Landfill expansion here at issue. ▮ The gist of Christward's argument is that because the court found there was no assessment in the EIR of cumulative impacts of the Landfill expansion project taken together with other proposed North County trash projects and "this EIR should arguably have taken into account what effect, if any, the other solid waste projects will have on this expansion," while not including in the court's judgment any requirement the County revise its cumulative impacts analysis, the result was to allow

piecemeal environmental review and to countenance the County's disregard of the cumulative impacts of its action.

Under the piecemeal environmental review segment of Christward's argument about an inadequate description of the project in the EIR, Christward emphasizes rules that the project description is "the '*sine qua non* of an informative and legally sufficient EIR,' " (*City of Santee* v. *County of San Diego* (1989) 214 Cal.App.3d 1438, 1454 [263 Cal.Rptr. 340], quoting *County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 192-193 [139 Cal.Rptr. 396]) and that CEQA requires a project to be defined broadly (Guidelines, § 15002, subd. (d)).

We are of the view that the project description, particularly the portion set forth above, adequately defines "the whole of [the] action, which has a potential for resulting in a physical change in the environment, directly or ultimately . . . ." (Guidelines, § 15378, subd. (a).) Contrary to Christward's argument, the description of the particular Landfill expansion is accurate and complete and the data in the "Project Description" section considers the effects other solid waste projects will have on the expansion.

As the trial court noted, the law does not require that a single EIR be prepared for all of the trash projects in North County or that a County-wide EIR be prepared. Though Christward argues otherwise, this case is not analogous to *City of Santee, supra,* 214 Cal.App.3d 1438, which disapproved an EIR for a temporary jail expansion under circumstances where the EIR did not specify the duration or future effects of the "temporary" project. On the record in that case, this court applied criteria established in *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 396 [253 Cal.Rptr. 426, 764 P.2d 278], stating that the EIR must include consideration of future environmental effects of the project if, "(1) [those effects are] a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects." The record in *City of Santee* showed that the project in question involved reasonably foreseeable future uses with environmental consequences and that a larger project was contemplated, with the Board declaring an emergency in the County concerning jail overcrowding and asking for study and reports on all possibilities of dealing with the problem, not just relocating a certain number of inmates from one jail to the proposed expanded jail project. Instead of having an EIR for the contemplated larger project, the Board was "chopping it up into smaller projects rather than dealing with it as a total 'program.' " (*City of Santee, supra,* 214 Cal.App.3d at p. 1454; see also *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283-284 [118 Cal.Rptr. 249, 529 P.2d 1017].) While not suggesting a "program EIR" or a tiered EIR was mandated (214 Cal.App.3d at

p. 1453, fn. 7),[4] this court overturned the EIR on the basis the description in the EIR did not "adequately apprise all interested parties of the true scope of the project for intelligent weighing of the environmental consequences of the project." (*Id.* at pp. 1454-1455.)

In this case, it cannot be denied that there were discussions about other solid waste landfills and projects in the North County area and other County locations. However, there is here no record reflecting a contemplated larger project with an analogous declaration of emergency in the whole County and request for a study and report on all possibilities. Nor is there a problem with a "temporary" project having no definitive duration stated. Most importantly, the EIR here under consideration does adequately apprise interested parties of the true scope of the project, thus allowing intelligent weighing of its environmental consequences. Thus we conclude, contrary to Christward's argument, *City of Santee* does not call for overturning the EIR here in question. There was no "chopping up" of a larger project in the project description we now review that would present a risk that it " 'cumulatively may have disastrous [environmental] consequences.' " (*Christward Ministry* v. *Superior Court* (1986) 184 Cal.App.3d 180, 196 [228 Cal.Rptr. 868], quoting *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 165 [217 Cal.Rptr. 893].) No piecemeal environmental review is involved. The project description permits the public, interested parties and public agencies to "balance the proposed project's benefits against its environmental cost, consider appropriate mitigation measures, assess the advantages of terminating the proposal and properly weigh other alternatives . . ." (*City of Santee, supra,* 214 Cal.App.3d at p. 1454.) The project description was adequate.[5]

Christward argues the EIR is inadequate for having failed to consider adequately the cumulative impacts of the proposed project. The argument is

---

[4] As described in *Laurel Heights Improvement Assn., supra,* 47 Cal.3d 376, 399, footnote 8, Guidelines section 15168, subdivision (a), explains "that an agency can use a 'program EIR,' for 'a series of actions that can be characterized as one large project and are related either: (1) Geographically, (2) As logical parts in the chain of contemplated actions, . . . or (4) As individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways.' Section 15385 of the Guidelines provides for 'tiering' of EIR's, which is 'the coverage of general matters in broader EIRs (such as on general plans or policy statements) with subsequent narrower EIRs . . . .' "

In *City of Santee, supra,* 214 Cal.App.3d at page 1454, this court suggested the " 'temporary' expansion of the Las Colinas [women's] detention facility to house men" would be an "excellent candidate" for a "Program EIR" or a tiered EIR, but we explicitly stated this was not mandated. (*Id.* at p. 1453, fn. 7.) In light of our conclusion in the present case that *City of Santee* does not represent analogous authority, we reject Christward's two-line conclusion that a program or tiered EIR was called for with respect to the Landfill expansion project here in question.

[5] Recently, this court reached a similar conclusion with respect to an EIR for a project to build a 1.8-mile stretch of a highway, State Route 56, that was planned eventually to extend

not supported by the record. Contrary to Christward's argument and the trial court's statement in its order that the EIR "does not contain an assessment of the cumulative impacts of this project taken together with those other [trash] projects," the EIR does contain an assessment of the cumulative impact of the Landfill expansion project, along with an analysis of cumulative impacts of the project in connection with other solid waste projects, including NCRRA's waste to energy facility, a new North County landfill, the Encina sludge composting facility, a recycling center, transfer stations and others. We cannot accept Christward's argument this cumulative impact assessment understates the cumulative impacts. Instead, it comports with CEQA. (See § 21083, subd. (b); Guidelines §§ 15355, 15130, 15065, subd. (c).)

## III

Christward contends the EIR is inadequate for failing to consider the potential significant adverse impact of the proposed project on Christward's use of its property for religious purposes. Christward relies on Guidelines appendix G, subdivision (w), which provides that a project normally will have a significant effect on the environment if it will conflict with established religious uses in the area. (See Guidelines §§ 15382, 15360, 15125, 15131, subd. (b).)

County argues that this contention was not preserved because it was not raised in the administrative hearing or the trial court. (§ 21177, subd. (a), "No action may be brought pursuant to Section 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person.") We cannot resolve the issue on the basis the County suggests. First, the matter was raised in the trial court under an essentially identical heading and argument as in this appeal. Second, Stephen Isaac's July 30, 1990, letter to the County's department of planning and land use, though emphasizing the matter of obstructing the "panoramic" and "awe-inspiring" ocean view from Questhaven, makes reference to Questhaven's "purpose as a religious retreat." This reference is sufficient to preserve the issue for argument in the trial court and on appeal.

Nevertheless, we agree with the trial court's assessment that the matter of the expansion project's interference with the view from Questhaven, not any interference with established religious uses, was the basis of

---

much farther in order to make an east-west connection between Interstate 5 and Interstate 805 in the Carmel Valley. (*Del Mar Terrace Conservancy, Inc.* v. *City Council.* 10 Cal.App.4th 712 [12 Cal.Rptr.2d 785].) Although the issue was framed in terms of whether the project was properly segmented, we viewed this as an attack, in part, on the adequacy of the project description (*id.* at p. 729), and upheld the EIR description for the project involving only a segment of the highway. (*Id.* at pp. 732-737.)

Christward's objection. Not only was view obstruction the focus of Christward's letter, it also was the apparent main point of Stephen Isaac's oral presentation to the Board. Isaac spoke of Questhaven as a "beautiful pristine area," and said, in part, "What concerns us particularly about the expansion is the height will interrupt one of our most spectacular views of the Pacific." Christward gave no explanation of what religious uses were made of Questhaven other than experiencing God in nature in this wilderness sanctuary having as a key element its view of the ocean. It was not a duty of the County independently to examine into and assess aspects of Questhaven's use for religious purposes other than the matter of the site furnishing a view. The County did conduct the assessment of the matter of view and concluded it would be impacted significantly and could not be mitigated to fully acceptable levels, issuing a statement of overriding considerations. In its response to Isaac's letter, the County specifically addressed the viewpoint that Isaac identified. At the hearing in the trial court, Christward suggested that it was not looking for a theological treatise but rather wanted a consideration of the identified adverse effects and "what it's doing to our religion just a mile down the road."

In the context of the concern only for view obstruction that Christward expressed to the County in this case and considering the rather ambiguous suggestion of what the County should have discussed in terms of the expansion project's impact on religious uses, we believe the County's treatment in the EIR of the matter of obstruction of the view from Questhaven, in combination with the EIR's identification of other adverse effects in general, adequately encompassed the proposed project's impact on Christward's established religious uses. We reject Christward's suggestion that because cases decided in 1969 and 1986 gave descriptions of its religious practices (see *Christward Ministry* v. *County of San Diego* (1969) 271 Cal.App.2d 805, 807-808 [76 Cal.Rptr. 854]; *Christward Ministry* v. *Superior Court, supra*, 184 Cal.App.3d 180, 197), this somehow charged the County with knowledge of those practices in 1990 with the result "the COUNTY again has ignored its concerns."

IV

Christward contends the mitigation monitoring plan is inadequate because it fails to specify when the proposed mitigation measures are to be implemented. The basis Christward cites for this argument is section 21081.6, which provides in part that when making findings required by CEQA, "the public agency shall adopt a reporting or monitoring program for the changes to the project which it has adopted or made a condition of project approval in order to mitigate or avoid significant effects on the environment. The reporting or monitoring program shall be designed to ensure compliance during project implementation."

Here, the mitigation monitoring program sets out the stages of the project at which each mitigation measure must be implemented. For example, it sets forth mitigation measures which shall be implemented "prior to approval of the final design plans," "prior to initiation of grading, construction and operation," "during the grading and construction phase of the project," "throughout the operational phase of the landfill" and "prior to landfill closure." This manner of designating the timing of implementing the mitigation measures fully complies with the meaning and intent of section 21081.6. Thus, Christward's argument in this regard is without merit.

Christward also argues that since the mitigation monitoring program was not made available with the EIR circulated to the public, concerned citizens and agencies were deprived of an opportunity to review and comment on its adequacy. This statement suggests the mitigation monitoring program is required to be included as part of the final EIR. The law clearly contemplates otherwise, for the mitigation monitoring program is required to be adopted "[w]hen making the findings required" (§ 21081.6), and those findings are made after considering the final EIR. (See § 21081; Guidelines, § 15091.) Nothing in CEQA or the Guidelines requires the mitigation monitoring plan to be in the EIR. (See § 21100; Guidelines §§ 15120-15132.) Thus, Christward's argument in this regard fails.

V

Christward contends its property interests do not constitute grounds for denial of an award of attorney fees under the private attorney general doctrine. In denying Christward's request for attorney fees under Code of Civil Procedure section 1021.5, the court stated that while "it's perhaps true that public interest is being vindicated by this writ," Christward's "private interests . . . with reference to the use of their property is the real basis for [the] action . . . ."

Under Code of Civil Procedure section 1021.5, the trial court has discretionary power and "its decision will be reversed only if there has been a prejudicial abuse of discretion. ' "To be entitled to relief on appeal . . . it must clearly appear that the injury resulting from such a wrong is sufficiently grave to amount to a manifest miscarriage of justice. . . ." ' However, 'discretion may not be exercised whimsically and, accordingly, reversal is appropriate "where no reasonable basis for the action is shown." ' " (*Baggett* v. *Gates* (1982) 32 Cal.3d 128, 142-143 [185 Cal.Rptr. 232, 649 P.2d 874], citations omitted.)

In making its decision under this statute, the trial court must realistically assess the litigation and determine from a practical perspective whether the action:

"(1) served to vindicate an important public right; (2) conferred a significant benefit on the general public or a large class of persons; and (3) imposed a financial burden on plaintiffs which was out of proportion to their individual stake in the matter. [Citations.]" (32 Cal.3d at p. 142, fn. deleted.)

The public always derives a "benefit" when illegal private or public conduct is rectified, but in order to determine whether a "significant" benefit has been conferred, the court must determine both the significance of the benefit and the size of the class receiving benefit, from a realistic assessment, in light of all the pertinent circumstances of the gains which have resulted in the particular case. (*Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 939-940 [154 Cal.Rptr. 503, 593 P.2d 200].)

Here, the benefits of the case were the judgment's requirements the County revise the water impacts section of the EIR and add certain information to the mitigation monitoring program concerning the responsible agent for enforcement in order to make both aspects comply with CEQA. Christward's additional challenges to the EIR were not successful. Before the hearing in this case, County already was under notice from the regional water quality control board that it must prepare a more detailed analysis of the water impacts of the proposed Landfill expansion. Thus, it was reasonable to conclude Christward's success in obtaining the judgment with respect to the water impacts did not itself confer a public benefit. It also was reasonable to view the requirement of the judgment that the responsible enforcement agent be identified as not significant within the meaning of private attorney general attorney fees statute. Moreover, we cannot quarrel with the reasonableness of the court's assessment of Christward's private interest in the litigation.

In short, Christward has not demonstrated a prejudicial abuse of discretion as set forth in *Baggett, supra*, 32 Cal.3d 128, 142-143. We affirm the denial of attorney fees to Christward under Code of Civil Procedure section 1021.5.

DISPOSITION

Judgment affirmed.

Benke, J., and Huffman, J., concurred.