Filed 2/1/24  In re G.V. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re G.V., et al., Persons Coming Under the Juvenile Court Law. | B328340 |
| _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 19CCJP02167C-E) |
| Plaintiff and Respondent, | |
| v. | |
| C.C., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mary E. Kelly, Judge.  Dismissed.

David M. Yorton, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

C.C. (Mother) is the mother of three children: a 10-year-old daughter G.V. and two sons, nine-year-old J.C. and two-year-old M.C. (collectively, Minors).[1] The juvenile court assumed dependency jurisdiction over Minors after finding G.V.'s stepfather sexually abused G.V. and Mother reasonably should have known of the abuse and failed to protect her. G.V.'s stepfather does not appeal the sex abuse finding against him, which means jurisdiction over the Minors will continue regardless of the outcome of this appeal. Under the circumstances, we shall dismiss the appeal as moot but also briefly explain for Mother's benefit why substantial evidence in any event supports at least one of the jurisdiction findings against her.

## I. BACKGROUND

### A. *Mother Learns of the Sexual Abuse*

In June 2022, Mother and Minors traveled to Mexico to visit relatives. While in Mexico, G.V. divulged to an aunt that her stepfather, who was M.C.'s biological father, (Stepfather) had sexually abused her. She did not provide the aunt with any details of the abuse and asked her aunt not to disclose the abuse to Mother.

Eventually, the aunt called Mother in September 2022 and relayed what G.V. told her. That same day, after G.V. confirmed that Stepfather had "touched" her, Mother scheduled a medical exam for G.V.

---

[1] These were the Minors' ages when dependency proceedings began.

In the days that elapsed waiting for the medical exam appointment, Mother discussed with Stepfather G.V.'s accusation of sexual abuse and he denied abusing her. On the day of G.V.'s physical exam, Stepfather, at Mother's request, moved out of the family home.

G.V. told the examining physician that Stepfather made her watch videos of "men with ladies shaking butts" and then "made her shake her butt like that." She also advised Stepfather had touched her vagina and she "seemed to say he put his penis near her vagina but not inside because he knew [M]other would leave him."

Los Angeles Police Department (LAPD) officers interviewed G.V. in response to a report by the examining physician. During the police interview, G.V. disclosed additional abuse. In addition to forcing her to watch pornographic videos, she stated Stepfather sexually abused her approximately 10 times over the course of the last two years and "touch[ed] her vagina, buttocks, and chest with his hands," forced her to "lick his penis," and "inserted his erect penis into [her] vagina." The police advised Mother that the matter would be reported to the Los Angeles County Department of Child and Family Services (the Department).

### B.     *The Department Investigates the Abuse Allegations*
The day after the medical examination and police interview, a Department social worker questioned Mother and G.V. at the family home, a small studio apartment.

Mother told the social worker that she repeatedly asked Stepfather to move out of the family home after learning of the abuse but each time G.V. would intervene and prevent him from leaving by blocking the door. Stepfather eventually moved out

4

when Minors were not present in the apartment. When asked why she did not call the Department or file a police report during the six days that elapsed between learning of the abuse allegation and taking G.V. to the doctor, Mother provided several reasons. Mother professed that she was "not saying I don't believe [G.V.]" because she was her daughter, but Mother believed G.V. was making a "serious accusation." Mother claimed she had not seen or heard any inappropriate conduct by Stepfather while he lived in the family's home. Mother also stated she did not find an opportunity to speak with G.V.in more detail about the nature of the abuse before Stepfather moved out of the home because of the close quarters at the family home and the presence of her other children. Mother also opined G.V. should undergo a "lie detector" test because she previously made sexual abuse allegations against her biological father that were not substantiated. Mother additionally shared she had pre-existing concerns about G.V.'s mental health and had previously requested a mental assessment of G.V.

G.V. repeated the allegations she had made previously to the doctor and the police about watching pornographic videos and then being made to recreate with Stepfather the sex acts depicted. G.V. also disclosed that in addition to nonconsensual vaginal and oral sex, Stepfather penetrated her anus "so many times [she did not] know the number." G.V. explained Stepfather would attempt to manipulate her by buying her toys and commit the acts of abuse when Mother was at work (Stepfather would track Mother's whereabouts via cellphone and terminate the abuse when Mother was returning home). G.V. told the social worker that the abuse stopped when she was ten years old.

The Department social worker also interviewed Stepfather and he denied ever touching G.V. or her siblings inappropriately. Stepfather told the social worker that G.V. had a history of making false accusations against both classmates and adults, including allegations of inappropriate touching and sexual abuse. Stepfather agreed, however, that it would be best if he did not return to Mother's home until after G.V. was no longer a minor.

The social worker also interviewed other family members. J.C. denied suffering from or witnessing sexual abuse by Stepfather or anyone else. The maternal grandmother, who lived near the family home and had regular contact with the family (including providing child care), denied observing any inappropriate conduct by Stepfather or any fearful conduct by G.V. toward Stepfather. The maternal grandmother also reported G.V. had a habit of lying and had told lies about the maternal grandmother to Mother.

In addition to family members, Department personnel interviewed G.V.' s fifth grade teacher and her therapist. The teacher, who had also taught G.V. in second and third grade, reported G.V. struggled to tell the truth and had been caught telling lies at school often. Although she found Mother to be a responsive parent, the teacher opined Mother currently appeared distant from G.V. and seemed not to believe the sexual abuse allegations against Stepfather. G.V.'s therapist opined Mother was dismissive of her daughter's allegations and appeared to think G.V. was lying.

*C.     G.V. Participates in a Forensic Interview and*
*Forensic Medical  Examination*

With a criminal investigation still underway as a result of the report to the LAPD, G.V. was scheduled to participate in a forensic interview.  Just before the interview took place, Mother met privately with the social worker assigned to the dependency investigation and told the social worker that G.V. did not want to talk to anyone because her allegations were "a lie."  Mother also informed the social worker that M.C. (who was with them at the time) was sick and Mother told G.V. to "hurry" because M.C. was sick.  The social worker informed Mother the interview would go forward as part of the criminal investigation but G.V. would not be forced to talk (and if G.V. refused to talk the forensic interviewer would know how to proceed).[2]

During the forensic interview, G.V. initially said her abuse allegations were "all a lie" and she wanted "all this stuff to end" because of the emotional pain it was causing her and Mother.  Almost immediately thereafter, however, G.V. reversed course and affirmed Stepfather had touched her inappropriately.  She began by describing in detail the most recent act of sexual abuse: anal penetration that occurred in the home's bathroom on a Saturday while Mother was asleep.  Stepfather stopped when he heard Mother waking up and, according to G.V., Mother "didn't even really notice."

When asked to describe the first incident of sexual abuse, which occurred when she was in the fourth grade, G.V. provided

---

[2]     The forensic interview, which was recorded, was observed contemporaneously by the social worker and a police detective. The audio recording of the interview was later transcribed.

an account of abuse that proceeded in largely the same fashion. Later in the day during this first instance of abuse, G.V. said she woke Mother up and complained to her about pain in her anus. In response to G.V.'s complaint, Mother asked if Stepfather had done "anything" to her. G.V. denied any abuse by Stepfather and explained she "felt pain because I hit myself."

When asked about other incidents of abuse, G.V. explained they followed a similar pattern, usually occurring on the weekend and in the bathroom, but related that the sexually abusive acts varied and included vaginal and oral penetration. As with the anal penetration, the vaginal penetration caused G.V. pain to the point of making her cry.

Mother took G.V. to a restroom break while the forensic interview was underway. After returning from the break, G.V. once again told the forensic interviewer that her allegations were a lie and she wanted the proceedings to be over so everything would "go back to how it was." But not long thereafter, G.V. told the interviewer that "all the touching did happen" and admitted she said it was a lie because she wanted "it all to end" and she was worried "they're going to take me away."[3]

A few days after the forensic interview, G.V. underwent a forensic medical examination. She told the examiner she was being examined "[b]ecause my stepfather touched me" (and added

---

[3]     J.C. also participated in a forensic interview. He denied suffering or witnessing any abuse. When asked about the allegations concerning his sister, he related he had not witnessed any abuse and Mother told him the allegations were "not true because [Stepfather] is good."

more graphic detail).  G.V. reported Stepfather "would instruct her not [to] tell her mother and would buy her toys."

The findings from the anogenital exam were "within normal limits."  As a result of her disclosures, G.V. was also tested for various sexually transmitted infections, the results of which were negative.  The forensic medical report advised that "[a] negative sexually transmitted infection test does NOT EXCLUDE a history of sexual abuse, and a normal exam CANNOT EXCLUDE a history of sexual abuse including sexual abuse in which there was penetration."

### D. The Department's Dependency Petition, Which the Juvenile Court Sustains

Following the forensic interview and examination, the Department filed a three-count dependency petition alleging sexual abuse of G.V. by Stepfather and a failure by Mother to protect G.V. from the abuse.  Although the petition contained three separate counts under Welfare and Institutions Code section 300, subdivisions (b) (substantial risk of suffering serious physical harm from a failure or inability to protect or supervise a child), (d) (sexual abuse by a member of the household or the failure of a parent to protect from sexual abuse), and (j) (substantial risk of abuse as a result of abuse of a sibling), the factual allegations supporting each count were identical.[4]  As to Mother specifically, the petition alleged she "reasonably should have known of [Stepfather's] ongoing sexual abuse of the child and failed to protect the child.  Furthermore, Mother repeatedly

---

[4]     Undesignated statutory references that follow are to the Welfare and Institutions Code.

questioned if the child was being truthful regarding the sexual abuse allegations. Such sexual abuse of [G.V.] and the mother's failure to protect the child endangers the child's physical health, safety[,] and well-being and places child and the child's siblings . . . at risk of serious physical harm, damage, danger, sexual abuse and failure to protect."

In advance of the adjudication hearing, a Department investigator re-interviewed G.V., Mother, and Stepfather. G.V. reaffirmed Stepfather sexually abused her and maintained that "everything [she] said is the truth." When asked if she felt Mother believed her, G.V. responded, "I do and I don't." Mother told the investigator that G.V. "tends to lie a lot" and may be bipolar but she (Mother) did not disbelieve her daughter's allegations. As Mother put it to the investigator, "if I did not believe [G.V.] then I wouldn't have kicked [Stepfather] out." Stepfather continued to deny all of the abuse allegations but reiterated his belief that he should not return to Mother's home until after G.V. turned 18 years old.

The Department recommended the juvenile court assert jurisdiction over Minors for two principal reasons: the consistency with which G.V. described the abuse in interviews with social workers, law enforcement, medical professionals, and forensic investigators; and Mother's doubts about G.V.'s veracity and failure to take immediate steps to protect her children, including allowing Stepfather to remain in the family home for almost a week after learning of the abuse. The Department observed that the family home is "a studio with very minimal space between the beds and the bathroom is next to the beds. It is concerning that [Mother] never heard anything while the child was being sexually assaulted in the same room or the bathroom. Mother should

have reasonably have known or had some suspicion that her daughter was being sexually abused." Because Minors expressed a willingness to continue living with Mother, the Department recommended they remain in her custody and care.

On April 3, 2023, the juvenile court held an adjudication hearing. After admitting into evidence the Department's reports (including the recordings and transcripts of G.V. and J.C.'s forensic interviews) and hearing argument from counsel, the court sustained the dependency petition's allegations as pled. The court found the video of G.V.'s interview with the forensic interviewer and "the graphic detail" she provided of the abuse to be "very compelling" evidence of the truth of the petition's abuse allegations; overall, the court found G.V. to be a "very credible" witness. As for the failure-to-protect allegation, the court found Mother "didn't protect her child when she had the opportunity to [do so]," and cited in particular Mother's decision to "continue[ ] to allow this man to be in the house" after learning of the abuse.

The juvenile court removed Minors from their respective fathers but allowed them to remain in the care and custody of Mother.

## II. DISCUSSION

"A case becomes moot when events "'render[ ] it impossible for [a] court, if it should decide the case in favor of plaintiff, to grant him [or her] any effect[ive] relief.'" [Citation.]" (*In re D.P.* (2023) 14 Cal.5th 266, 276; accord, *In re Rashad D.* (2021) 63 Cal.App.5th 156, 163 ["'the critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error'"].) "In th[e dependency] context, relief is effective when it 'can have a

11

practical, tangible impact on the parties' conduct or legal status.' [Citation.] It follows that, to show a need for effective relief, the plaintiff must first demonstrate that he or she has suffered a change in legal status." (*D.P.*, *supra*, at 277; see also *id*. at 276 ["For relief to be 'effective,' two requirements must be met. First, the plaintiff must complain of an ongoing harm. Second, the harm must be redressable or capable of being rectified by the outcome the plaintiff seeks"].) In other words, a parent must "demonstrate[ ] a specific legal or practical consequence that would be avoided upon reversal" to overcome mootness and warrant merits review. (*Id*. at 283.)

Mother's appeal is moot. The unchallenged jurisdiction finding against Stepfather supports the juvenile court's exercise of jurisdiction over Minors regardless of whether the failure to protect finding against Mother is supported by substantial evidence. (*D.P.*, *supra*, 14 Cal.5th at 283 ["'"[a]s long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate"'"]; *In re Briana V*. (2015) 236 Cal.App.4th 297, 308 ["'[A] jurisdictional finding good against one parent is good against both. More accurately, the minor is a dependent if the actions of either parent bring [the minor] within one of the statutory definitions of a dependent'"].) Although the appeal is moot and we will dismiss it for that reason, we briefly describe, for Mother's benefit, why the petition's allegations that she failed to protect G.V. were supported by substantial evidence. (See, e.g., *In re Alexis E*. (2009) 171 Cal.App.4th 438, 451 [affirming finding of jurisdiction over minor because the father did not challenge all bases for jurisdiction, but "not[ing]" the court's view on the challenged finding "[f]or [the] Father's benefit"]; see also *In re I.J.* (2013) 56 Cal.4th 766, 773.)

12

Section 300, subdivision (b)(1) authorizes a juvenile court to assume dependency jurisdiction over a child when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [¶] (A) [t]he failure or inability of the child's parent . . . to adequately supervise or protect the child. [¶] (B) The willful or negligent failure of the child's parent . . . to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left." Section 300, subdivision (d) similarly but more specifically provides for dependency jurisdiction when a parent or guardian "has failed to adequately protect [a] child from sexual abuse when the parent or guardian knew or reasonably should have known that the child was in danger of sexual abuse." We review juvenile court jurisdiction findings for substantial evidence, drawing "'all reasonable inferences from the evidence to support the findings . . . [and] review[ing] the record in the light most favorable to the court's determinations . . . .' [Citations.]" (*In re R.T.* (2017) 3 Cal.5th 622, 633.)

A failure to protect can manifest itself in a number of ways. For example, it can include a parent's failure to remove a child from an abuser's presence or to report the abuse to the authorities. (See, e.g., *In re Amy M.* (1991) 232 Cal.App.3d 849, 860, 861-862, 863 [dependency jurisdiction warranted where the mother failed to protect her daughter by allowing her to remain in the care of her father after the daughter told mother he raped her].) In addition, a parent's refusal to believe a child's abuse allegations can constitute a failure to protect. (See, e.g., *In re J.K.* (2009) 174 Cal.App.4th 1426, 1439 [dependency jurisdiction warranted where the mother disbelieved her daughter's disclosures of sexual abuse]; *In re Maria R.* (2010) 185

13

Cal.App.4th 48, 60 [affirming failure to protect finding because "[r]ather than protect the girls, [mother] denied that any abuse had occurred and maintained that the girls were lying"], disapproved in part on another ground in *I.J.*, *supra*, 56 Cal.4th 766; *In re Katrina W.* (1995) 31 Cal.App.4th 441, 445, 446-447 [holding substantial evidence supported juvenile court's exercise of jurisdiction where father sexually molested daughter and mother was in denial of the molestation].)

On this record, there is substantial evidence supporting the juvenile court's finding that Mother failed to protect G.V. and her siblings from Stepfather's sexual abuse, of which mother knew or at least should have known. When G.V. complained to Mother of pain in her anus the day Stepfather began his sexual abuse, Mother—without any apparent prompting by G.V.—immediately inquired whether Stepfather was the cause of the pain. That unusual, unprompted question is strong evidence that Mother was for quite some time aware of at least a danger that Stepfather was sexually abusing G.V. In addition, in light of the close quarters of the family home and the repeated episodes of painful abuse, the juvenile court was justified in concluding Mother at least should have been aware that the abuse was occurring. Moreover, once indisputably on notice of the inappropriate touching of G.V., Mother did not take decisive action: she did not promptly report the matter to law enforcement (or the Department) or compel Stepfather to leave the home immediately. Mother also never sought to learn more from G.V. about the reported abuse and made it obvious to other family members, social workers, investigators, teachers, therapists, and

14

forensic interviewers that she doubted the veracity of G.V.'s allegations.[5]

DISPOSITION

The appeal is dismissed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, Acting P. J.

We concur:

MOOR, J.

KIM, J.

---

[5]      G.V.'s behavior after returning from the restroom break during the forensic interview provides a basis to conclude Mother was not just doubtful about the veracity of G.V.'s abuse claims but also was making affirmative efforts to get G.V. to recant the abuse allegations.  It perhaps goes without saying, but that too is solid evidence of a failure to adequately protect from a known danger of sexual abuse.