[No. C044989. Third Dist. Mar. 22, 2005.]

SIERRA CLUB, Plaintiff and Appellant, v.
THE WEST SIDE IRRIGATION DISTRICT et al., Defendants and
Respondents;
CITY OF TRACY, Real Party in Interest and Respondent.

[No. C045015. Third Dist. Mar. 22, 2005.]

SIERRA CLUB, Plaintiff and Appellant, v.
BANTA-CARBONA IRRIGATION DISTRICT et al., Defendants and
Respondents;
CITY OF TRACY, Real Party in Interest and Respondent.

## COUNSEL

Law Offices of Donald B. Mooney and Donald B. Mooney for Plaintiff and Appellant.

Herum Crabtree Brown, Jeanne M. Zolezzi, Steven A. Herum and Jennifer L. Spaletta for Defendants and Respondents.

Debra C. Corbett; Lennihan Law, Martha H. Lennihan and Lori Lei K. Ozaki for Real Party in Interest and Respondent.

## OPINION

**NICHOLSON, J.**—The Sierra Club petitioned for writs of mandate to overturn two irrigation districts' decisions to assign certain water rights to the City of Tracy. The Sierra Club alleged the districts violated the California Environmental Quality Act by using negative declarations instead of environmental impact reports to analyze the assignments' environmental impacts. The trial court denied the petitions, and the Sierra Club appealed. We affirm.

## FACTS

In 1993, real party in interest City of Tracy (City) adopted its general plan for directing land use and future development within the City and its sphere of influence. Forecasting large demand for development in the City, the general plan established the City's policies for regulating growth anticipated to provide dwelling units and employment opportunities for nearly 130,000 new residents over the plan's 20-year span. Such growth would almost quadruple the City's 1990 population of 33,558.

Complying with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.), the City prepared an environmental impact report (EIR) that analyzed the significant environmental impacts such development could foreseeably cause. One concern was the City's ability to provide sufficient water for the growth. The general plan EIR estimated the City's available water supply at that time was approximately 16,000 acre-feet per year. 10,000 acre-feet came from the federal Central Valley Project via the Delta-Mendota Canal pursuant to a contract with the United States Bureau of Reclamation. The City diverted this water directly from the canal through its own turnout and into its treatment plant. The City's remaining supply came from groundwater wells. However, in the general plan, the City established a policy of reducing its reliance on groundwater for daily needs and relying instead on surface water.

The general plan EIR calculated the City would need a total of 39,000 acre-feet per year of potable water upon its build-out. (The EIR noted an additional 7,800 acre-feet per year would be used for irrigation purposes, but this demand could be met with reclaimed water.) The City would have to supplement its current water supply with other surface water sources in order to obtain the additional 29,000 acre-feet of potable surface water.

The EIR recognized a number of irrigation districts surrounding the City held surface water rights to Sacramento Delta water or held contracts with the Bureau of Reclamation for surface water from the Central Valley Project. Two of those districts were defendants The West Side Irrigation District (West Side) and Banta-Carbona Irrigation District (Banta-Carbona) (collectively, the Districts). The EIR noted the City was "exploring the possibility of acquiring agricultural surface water rights whose irrigation districts are being developed to urban uses."

The adopted general plan required the City to ensure adequate water supply would be provided for all development. It directed the City to pursue acquiring additional sources of water supply, including the possible conversion of agricultural water rights to municipal and industrial uses and the

acquisition of water rights from outside entities. The general plan EIR analyzed the environmental impacts that implementing this policy would foreseeably cause.

After adopting the general plan, the City continued to monitor its water supply. Pursuant to state law, the City prepared an urban water management plan, and updates that plan every five years. Every six months, the City disseminates a water inventory report analyzing the sufficiency of the City's water supply to meet expected demand.

In 2001, the City adopted a groundwater management policy, under which the City intended to increase its groundwater production from approximately 6,000 acre-feet per year to 9,000 acre-feet per year. This action would provide an interim water source for development until new surface water sources were secured. It increased the City's available water supply to 19,000 acre-feet per year, still 20,000 acre-feet short of the general plan's requirements.

The City's water management report noted other actions taken by the City to increase its water supply. One action was the City's participation in the South County Surface Water Supply Project. The City partnered with the cities of Manteca, Lathrop and Escalon, and the South San Joaquin Irrigation District, to develop a water treatment plant and pipeline to deliver water from the Stanislaus River. The City would receive 10,000 acre-feet of water per year from this project. In a separate legal action, plaintiff Sierra Club challenged the sufficiency of the EIR prepared for that project. The trial court rejected the Sierra Club's arguments, and the Sierra Club has appealed the judgment to this court, where the matter is pending. (*Sierra Club v. South San Joaquin Irrigation Dist.* (C039612, app. pending).)

Another set of steps taken by the City to procure more surface water was to negotiate assignments of water rights in the Central Valley Project from West Side and Banta-Carbona to itself. It is these assignments the Sierra Club challenges in this action.

West Side is located adjacent to, and at places overlaps, the City along the City's west and east sides. It has a contract with the Bureau of Reclamation to receive up to 7,500 acre-feet per year of Central Valley Project water for agricultural, municipal and industrial uses. West Side obtains this water through turnouts on the Delta-Mendota Canal located approximately two miles north of the City's turnout.

Due to increasing urbanization, West Side has shrunk in size and no longer has the demand for all of its water supply. In 2001, West Side and the City

negotiated an agreement under which West Side agreed to assign to the City its right to collect 2,500 acre-feet of Central Valley Project water. West Side also gave the City an exclusive option to obtain West Side's right to an additional 2,500 acre-feet of Central Valley Project water. The City would access this water through its own turnout on the Delta-Mendota Canal.

The agreement was contingent in part upon the parties' compliance with applicable environmental laws, including CEQA. The parties agreed West Side would serve as the lead agency for purposes of CEQA review, and the City would act as a responsible agency.

Also in 2001, the City entered into a similar agreement with Banta-Carbona. Like West Side, Banta-Carbona lies adjacent to, and overlaps portions of, the City. It also has a contract with the Bureau of Reclamation for Central Valley Project water, although Banta-Carbona's right is for a maximum of 25,000 acre-feet of water per year. Banta-Carbona takes its delivery of this water from the Delta-Mendota Canal via a turnout located approximately 3.6 miles from the City's turnout.

Banta-Carbona agreed to assign its rights to 5,000 acre-feet of Central Valley Project water to the City. The City would obtain this water through its own turnout on the Delta-Mendota Canal. The contract was conditioned on the parties' complying with CEQA. It designated Banta-Carbona as the lead agency and the City as a responsible agency.

Following their initial reviews of the proposed assignments, the Districts in 2002 determined they would issue negative declarations for their respective contracts instead of EIR's and gave public notice of their determinations. The Districts received no comments during the public review period on their negative declarations.

After the close of the public review period, the Districts received a letter from the Sierra Club challenging the negative declarations on numerous grounds. Although not obligated to respond to the letter under CEQA due to its untimeliness, the Districts responded to the Sierra Club's arguments in their final negative declarations. On September 11, 2002, both Districts' boards of directors approved the final negative declarations for their respective projects and approved the assignments.

The Sierra Club petitioned for writ relief on both approvals, claiming the projects required a joint EIR. The trial court denied both petitions, ruling the Sierra Club failed to produce substantial evidence by which a fair argument could be made that the projects would have a significant impact on the environment.

Before us, the Sierra Club argues the Districts' use of negative declarations instead of a joint EIR violated CEQA in four respects: (1) the parties improperly segmented environmental review by splitting the assignments into two projects instead of having the City act as lead agency to consider both assignments as one project; (2) the negative declarations failed to discuss and disclose the cumulative impacts associated with the assignments; (3) the negative declarations failed to analyze whether the assignments would induce growth beyond that projected in the general plan; and (4) the Districts failed to determine what effect cutbacks in delivery of Central Valley Project water would have on the environment. We address each argument in turn.

## DISCUSSION

## I

### Standard of Review

■ Our role is the same as the trial court's role. (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 357 [110 Cal.Rptr.2d 579].) Our inquiry concerns whether the Districts abused their discretion. Under CEQA, abuse of discretion is established if the Districts did not proceed in the manner required by law, or if their decisions are not supported by the requisite amount of evidence. (Pub. Resources Code, §§ 21168, 21168.5; *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573 [38 Cal.Rptr.2d 139, 888 P.2d 1268].)

■ The Districts abused their discretion if their actions or decisions did not substantially comply with CEQA's requirements. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 [253 Cal.Rptr. 426] (*Laurel Heights I*).) "A court reviewing an agency's decision not to prepare an EIR in the first instance must set aside the decision if the administrative record contains substantial evidence that a proposed project might have a significant environmental impact; in such a case, the agency has not proceeded as required by law. [Citation.] Stated another way, the question is one of law, i.e., 'the sufficiency of the evidence to support a fair argument.' [Citation.] Under this standard, deference to the agency's determination is not appropriate and its decision not to require an EIR can be upheld only when there is no credible evidence to the contrary. [Citation.]" (*Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1317–1318 [8 Cal.Rptr.2d 473].)

However, we are not at liberty to impose procedural requirements beyond those stated in CEQA and its implementing regulations, the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq. (CEQA Guidelines)). (Pub. Resources Code, § 21083.1.)

## II

### *Segmentation of Environmental Review*

The Sierra Club argues the Districts and the City improperly segmented environmental review of the two assignment approvals. It claims the assignments were actually one project for purposes of CEQA: the transfer of 10,000 acre-feet of agricultural water from the Central Valley Project to the City for residential and industrial uses. To avoid full CEQA review of this project, the City allegedly chopped it into two smaller projects by treating each assignment as a separate project and having the Districts serve as lead agencies for each assignment. We disagree.

For purposes of CEQA, a "project" is "the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and that is any of the following:

"(1) An activity directly undertaken by any public agency . . . . [¶] . . . [¶]

"(c) The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (CEQA Guidelines, § 15378, subds. (a), (c).)

■ A public agency may not divide a single project into smaller individual projects in order to avoid its responsibility to consider the environmental impacts of the project as a whole. (*Orinda Assn. v. Board of Supervisors* (1986) 182 Cal.App.3d 1145, 1171 [227 Cal.Rptr. 688].) At issue here is what is the activity, or the whole of the action, that is being approved.

Courts have considered separate activities as one CEQA project and required them to be reviewed together where, for example, the second activity is a reasonably foreseeable consequence of the first activity (*Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263 [118 Cal.Rptr. 249, 529 P.2d 1017]); the second activity is a future expansion of the first activity that will change the scope of the first activity's impacts (*Laurel Heights I, supra,* 47 Cal.3d 376); or both activities are integral parts of the same project (*No Oil, Inc. v. City of Los Angeles* (1987) 196 Cal.App.3d 223 [242 Cal.Rptr. 37]).

However, where the second activity is independent of, and not a contemplated future part of, the first activity, the two activities may be reviewed separately, even though they may be similar in nature. (*Christward Ministry v. County of San Diego* (1993) 13 Cal.App.4th 31 [16 Cal.Rptr.2d 435] (*Christward Ministry*).)

The CEQA Guidelines capture these holdings as follows: "Where individual projects are . . . to be undertaken and where the total undertaking comprises a project with significant environmental effect, the Lead Agency shall prepare a single program EIR for the ultimate project . . . . *Where one project is one of several similar projects of a public agency, but is not deemed a part of a larger undertaking or a larger project, the agency may prepare one EIR for all projects, or one for each project, but shall in either case comment upon the cumulative effect.*" (CEQA Guidelines, § 15165, italics added.)

In *Christward Ministry*, a property owner challenged a county's certification of an EIR analyzing a proposed expansion of a public landfill. The property owner claimed the EIR was inadequate because, among other matters, it failed to define as its project all proposed public waste-collection projects in the area. (*Christward Ministry, supra,* 13 Cal.App.4th at pp. 36, 38–39.) The Court of Appeal disagreed, noting the other projects were independent of the proposed landfill expansion and were proceeding regardless. They were not a reasonably foreseeable consequence of the landfill project, nor was the main project part of a larger contemplated project. The EIR thus was not inadequate for failing to include the other waste projects as part of the project being analyzed. (*Id.* at pp. 41–47.)

The Sierra Club argues the activity, or whole of the action, approved here was the assignment of rights to 10,000 acre-feet of water. It claims the two separate approvals by the Districts are sufficiently related to be considered as one project and to be analyzed together in one EIR. The Sierra Club asserts both assignments rely on virtually identical initial studies, both require approval from the City and the Bureau of Reclamation, both seek 5,000 acre-feet from the Central Valley Project, and both will convert 5,000 acre-feet of agricultural water to urban uses.

■ The City and the Districts disagree, as do we. The rule prohibiting segmentation of a CEQA project into smaller projects does not apply here because the assignments are two separate projects independent of each other. The assignments were approved by different independent agencies. The initial studies stated the assignments were not interrelated and could be implemented independently of each other. Neither was contingent on the other. The assignments involve separate water rights; they transfer different amounts of

water; and they occur under separately negotiated agreements that contain different terms from each other. Moreover, both initial studies acknowledge the other proposed assignment and analyze the cumulative impacts of both assignments.

■ The Districts also committed no error by serving as lead agencies for their respective projects. Under CEQA regulations, they and the City were qualified to serve as lead agencies. When that situation occurs, the regulations allow the agencies to designate by agreement which entity will serve as lead agency. (CEQA Guidelines, § 15051, subd. (d).) Here, the City and the Districts lawfully agreed each District would serve as lead agency for its own assignment.

### III

*Cumulative Impacts*

The Sierra Club argues the Districts' initial studies violated CEQA by failing to analyze the assignments' effects on cumulative impacts. We disagree.

■ In short, "a cumulative impact of a project is an impact to which that project contributes and to which other projects contribute as well. [¶] The project must make some contribution to the impact; otherwise, it cannot be characterized as a cumulative impact of that project." (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2003) § 13.36, p. 533.)

The CEQA Guidelines define cumulative impacts as "two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts.

"(a) The individual effects may be changes resulting from a single project or a number of separate projects.

"(b) The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonably foreseeable probable future projects. Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time." (CEQA Guidelines, § 15355.)

"When assessing whether a cumulative effect requires an EIR, the lead agency shall consider whether the cumulative impact is significant and

whether the effects of the project are cumulatively considerable. An EIR must be prepared if the cumulative impact may be significant and the project's incremental effect, though individually limited, is cumulatively considerable. 'Cumulatively considerable' means that the incremental effects of an individual project are significant when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects." (CEQA Guidelines, § 15064, subd. (h)(1).)

The Sierra Club faults the Districts' initial studies for not evaluating the assignments' incremental effects when viewed in connection with alleged "cumulative impacts on the regional hydrology of the Delta and San Joaquin River ecology of other water transfers that have been approved . . . or that are pending or proposed . . . ." It lists certain projects it argues should have been included in the analysis. It also claims the studies failed to analyze cumulative growth-inducing impacts.

The Districts' initial studies did not expressly determine the existence of any cumulative impact, including cumulative growth-inducing impacts. Instead, the studies first listed a number of different ongoing and proposed development plans and projects for the area that, if implemented, would no doubt create significant cumulative impacts. Next, however, the studies determined the water assignments would have no *incremental* effect on that large set of potential cumulative impacts because the assignments would have no impact on area hydrology and would have no impact on cumulative growth beyond what had already been reviewed and approved in the general plan EIR.

Each of the two studies thus concluded: "As indicated in this [study], implementation of the Proposed Action would not cause adverse environmental effects. No changes to the physical, biological, or cultural character of the environment would occur other than the conveyance of water from the [district] service area to the City of Tracy service area. The use and disposal of the assigned [Central Valley Project] water supplies would be performed in a manner consistent with the City's General Plan, other environmental documents prepared in accordance with CEQA, and prescribed measures assigned by regulatory agencies with authority over such facilities. [¶] Implementation of the Proposed Action would accommodate the planned development of lands identified in the City General Plan, and development of those lands has already been addressed in the General Plan EIR. The environmental conditions would essentially be the same whether or not the Proposed Action is implemented."

When there is no substantial evidence of any individual potentially significant effect by a project under review, the lead agency may reasonably

conclude the effects of the project will not be cumulatively considerable, and it need not require an EIR on this basis. (*Leonoff v. Monterey County Bd. Of Supervisors* (1990) 222 Cal.App.3d 1337, 1358 [272 Cal.Rptr. 372].)

The Sierra Club does not cite any substantial evidence upon which we could base a fair argument that the assignments may have a significant effect on the environment, or that an individual effect of the assignments may create an environmental impact that is also cumulatively considerable. Merely listing, as the Sierra Club does, other projects occurring in the area that may cause significant cumulative impacts is not evidence that the assignments will have impacts or that their impacts are cumulatively considerable. (CEQA Guidelines, § 15064, subd. (h)(4).)

Thus, the Districts evaluated cumulative impacts, including cumulative growth-inducing impacts, in the manner required by CEQA.[1]

IV

*Growth-inducing Impacts*

The Sierra Club argues the initial studies failed to analyze whether the assignments would induce growth beyond that already approved in the general plan and analyzed in the general plan EIR. It claims the water from the assignments increases the City's water supply by nearly 50 percent and is not restricted to development approved in the general plans. It asserts the Districts abused their discretion by failing to address the impacts from unplanned growth induced by the assignments. We disagree.

The initial study clearly states the water was to be assigned only to those areas already subject to the City's general plan. Water from the assignments will be commingled with the City's existing supplies and will "provide additional water for uses that will become established according to the City's

---

[1] We note each initial study concluded the proposed action's "contribution to cumulative impacts is considered to be de minimus, and thus is not significant." In *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98 [136 Cal.Rptr.2d 441], we invalidated former CEQA Guidelines section 15064, subdivision (i)(4), which allowed a lead agency to conclude a project's de minimis contribution to cumulative impacts was not significant. (103 Cal.App.4th at pp. 116–121.) "[T]he guiding criterion on the subject of cumulative impact," we stated, "is whether any additional effect caused by the proposed project should be considered significant given the existing cumulative impact." (*Id.* at p. 118.)

Here, there is no substantial evidence of any additional effect, and thus, no cumulative effect. Accordingly, the initial studies' use of the concept of "de minimis" impact did not violate our holding in *Communities for a Better Environment v. California Resources Agency, supra,* 103 Cal.App.4th 98.

General Plan." The discussions of growth-inducing impacts in the general plan EIR were properly incorporated into the initial studies, and that was sufficient under these circumstances. (See *Friends of the Eel River v. Sonoma County Water Agency* (2003) 108 Cal.App.4th 859, 877 [134 Cal.Rptr.2d 322].)

There is no evidence in the record the assignments will induce growth not already planned and evaluated on a macro level in the general plan and the general plan EIR. Indeed, the assignments can result in a possible increase in the City's surface water supply of only 10,000 acre-feet. Assuming the City is also able to obtain the 10,000 acre-feet of water from the South County Surface Water Supply Project and the City continues to rely on its 9,000 acre-foot supply of groundwater, the City will be able to provide only the additional 29,000 acre-feet of surface water the general plan EIR determined was required for the growth approved in the general plan. The City will have to look elsewhere should it desire to serve more development than that already approved and analyzed in the general plan.

■ The Sierra Club's failure to raise any facts to suggest cumulative or growth-inducing impacts exposes a possible intent to use CEQA simply to create delay. We caution CEQA plaintiffs "that rules regulating the protection of the environment must not be subverted into an instrument for the oppression and delay of social, economic, or recreational development and advancement." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 576 [276 Cal.Rptr. 410, 801 P.2d 1161].)

V

*Impacts from Water Cutbacks During Droughts*

In 1998, the Bureau of Reclamation determined it could not guarantee its contractors their full allotment of Central Valley Project water during drought years. The Sierra Club claims the initial studies failed to analyze any impacts that may occur should the Bureau cut back on its water deliveries to the City under the assignment. We disagree.

The initial studies directly addressed this issue. They acknowledged the Bureau would cut back their water deliveries during drought years. They then analyzed the transfers on the assumption the Bureau would in fact cut back water, and would deliver a total of 6,000 acre-feet instead of the potential 10,000 acre-feet agreed to in the assignments. Thus the entire environmental analysis consists of analyzing the impacts that would occur under the very situation of which the Sierra Club complains.

■ The Sierra Club argues deliveries in some years could be less than 6,000 acre-feet. It is also true in some years delivery could be more than 6,000 acre-feet. There is no evidence in the record suggesting the 6,000 acre-feet assumption is unreasonable. For us to require more analysis than what was done would be to require the City to engage in sheer speculation, an act CEQA does not require. (*Laurel Heights I, supra*, 47 Cal.3d at p. 398.)

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to the Districts and the City. (Cal. Rules of Court, rule 27(a).)

Davis, Acting P. J., and Robie, J., concurred.