Filed 9/27/22  Raptors Are The Solution v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RAPTORS ARE THE SOLUTION,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>THE SUPERIOR COURT OF ALAMEDA COUNTY,<br><br>    Defendant and Respondent;<br><br>LIPHATECH, INC. et al.,<br><br>    Real Parties in Interest. | A161787<br><br>(Alameda County Super. Ct. No. RG18908605) |

Plaintiff and appellant Raptors Are The Solution (Raptors) appeals the trial court's order denying its petition for writ of mandate filed against California Department of Pesticide Regulation (the Department).  The petition alleged that the Department abused its discretion and acted contrary to the law in its decision not to reevaluate diphacinone, a registered rodenticide.

We reverse the trial court's judgment denying Raptors' petition for writ of mandate.

## BACKGROUND

Before turning to the factual and procedural history of this case, we first summarize the regulations pertaining to the Department's registration, renewal, and reevaluation of pesticides to provide context for Raptors' challenge.

## I.

### *Registration of Pesticides*

The Department oversees a pesticide registration program that aims "[t]o provide for the proper, safe, and efficient use of pesticides essential for production of food and fiber and for protection of the public health and safety" while protecting the environment "from environmentally harmful pesticides by prohibiting, regulating, or ensuring proper stewardship of those pesticides." (Food & Agr. Code, § 11501, subds. (a), (b).)

A pesticide must have a certificate of registration from the Department before it can be manufactured or sold in California. (Food & Agr. Code, § 12811.) A pesticide must first be registered by the United States Environmental Protection Agency (the EPA) in order to be eligible for registration in California. (7 U.S.C. § 136a.) The Department then conducts "a thorough and timely evaluation" of the pesticide pursuant to Food and Agricultural Code section 12824. This includes the review of specific data that the registrant was required to submit to the EPA as well as supplemental data required by the Department. (Cal. Code Regs., tit. 3, § 6159.)[1]

The Department may refuse to register a pesticide if, among other reasons, a pesticide "has demonstrated serious uncontrollable adverse effects

---

[1] All further statutory references are to title 3 of the California Code of Regulations unless otherwise noted.

2

either within or outside the agricultural environment" or if its use "is of less public value or greater detriment to the environment than the benefit received by its use." (Food & Agr. Code, § 12825, subds. (a), (b).) The Department may also register a pesticide but place appropriate restrictions on its use, including "limitations on quantity, area, and manner of application." (*Id.*, § 12824.)

## II.

### *The Renewal Process*

Pesticide registrations expire on the last day of each year and must be renewed annually with the Department. (Food & Agr. Code, § 12817.) As part of the renewal application, the registrant must pay a fee and certify that he or she has submitted all known "factual or scientific evidence of any adverse effect or risk of the pesticide to human health or the environment." (§§ 6210, subd. (a), 6215, subd. (a).)

"Each renewal shall be issued within 60 days after the [Department] receives an accurate and complete renewal application unless the [Department] takes action pursuant to Sections 12816, 12825, or 12827 of the Food and Agricultural Code." (§ 6215, subd. (b).) Those referenced sections provide that a registration may be cancelled if it fails to satisfy the criteria for registration or if the registrant otherwise fails to comply with the Food and Agricultural Code.

Further, the Department shall, "when renewing a pesticide without a reevaluation, make a written finding that [it] has not received sufficient information necessitating reevaluation pursuant to Sections 6220 and 6221." (§ 6215, subd. (c).) When registering, renewing, or reevaluating a pesticide, the Department must post its proposed decision on its official bulletin boards for 30 days for public review and comment. (§ 6253, subd. (a).)

3

## III.

### *The Reevaluation Process*

"The [Department] may, at any time, evaluate a registered pesticide . . . . The [Department] shall investigate all reported episodes and information received by the [Department] that indicate a pesticide may have caused, or is likely to cause, a significant adverse impact, or that indicate there is an alternative that may significantly reduce an adverse environmental impact. If the [Department] finds from the investigation that a significant adverse impact has occurred or is likely to occur or that such an alternative is available, the pesticide involved shall be reevaluated." (§ 6220.) The specific factors that warrant reevaluation include environmental contamination, pesticide residue overtolerance and fish or wildlife hazard. (§ 6221.)

"If information is obtained from an individual or organization indicating possible adverse effect from the use of a pesticide, the [Department] shall respond in writing to the individual or organization indicating the reasons for [its] decision either to reevaluate or not reevaluate the pesticide registration based upon the information submitted." (§ 6222, subd. (b).) The Department's decision to reevaluate a pesticide is not tied to the 60-day renewal period for the registration of the pesticide. (*Californians for Alternatives to Toxics v. Department of Pesticide Regulation* (2006) 136 Cal.App.4th 1049, 1066 (*CATS*).)

## IV.

### *Raptors' Challenge to the Renewal of Diphacinone*

On December 22, 2017, in response to the Department's proposed decision to renew rodenticide registrations for 2018, Raptors requested that the Department initiate reevaluation of three first-generation anticoagulant

rodenticides (FGARs) and four second-generation anticoagulant rodenticides (SGARs).[2] Raptors argued that the continued use of these rodenticides posed a significant risk and/or is likely to have significant cumulative impacts on wildlife, and that the Department was therefore required to reevaluate these rodenticides pursuant to section 6220. Raptors attached several exhibits to its request and provided additional information and data over the course of the next several months in support of its request for reevaluation.

In March 2018, the Department responded to Raptors that it was "in the process of reviewing data submitted by the California Department of Fish and Wildlife and wildlife organizations" to determine the potential adverse impacts of the continued use of FGARs and SGARs on non-target wildlife. The Department further wrote that it was "proceeding with the renewal of [the seven rodenticides] and will not be placing them into reevaluation at this time." On April 18, 2018, the Department published a "Final Decision Regarding Renewal or Registration of Pesticide Products for 2018" that confirmed its decision to renew the subject rodenticides without reevaluation.

On June 13, 2018, Raptors filed a verified petition for writ of mandate. The petition alleged two causes of action against the Department for violation of the California Environmental Quality Act (CEQA) and violation of the Department's own regulations based on its decision to renew the subject rodenticides for 2018 without reevaluation. On October 19, 2018, Raptors filed an amended petition that added various agencies and companies as real

---

[2] The three FGARs are diphacinone, chlorophacinone and warfarin. The four SGARs are brodifacoum, bromadiolone, difethialone, and difenacoum. Anticoagulant rodenticides generally work by disrupting the blood-clotting mechanism in the target animal, which causes hemorrhaging and ultimately leads to death.

parties in interest. These parties had all received a renewal from the Department for one or more of the seven challenged rodenticides for 2018.

On November 16, 2018, the Department wrote to Raptors' counsel that it had completed its investigation of the subject rodenticides in response to Raptors' request and that it would begin reevaluation of SGARs, but not FGARs. The Department reasoned that its "investigation of the reported impacts found that the rate of FGAR exposure among non-target wildlife is generally decreasing and is lower than for SGARS." The letter was accompanied by a 35-page report that summarized the Department's investigation of FGARs and SGARs based on the data submitted and its reasons for placing SGARs into reevaluation but not FGARs. At the same time, the Department published its proposed decision to reevaluate the four SGARs.

The Department subsequently filed a demurrer to the first amended petition that argued, among other things, that the Department was not obligated to place a pesticide into reevaluation during the 60-day renewal period based on the holding in *CATS, supra*, 136 Cal.App.4th at page 1066 ("[r]eevaluation can take place at any time and is not linked in any way to annual renewal"). The trial court agreed and sustained the demurrer with leave to amend.

On May 24, 2019, Raptors filed a second amended petition that narrowed its challenge to the Department's decision to renew the registration of diphacinone (one of the three FGARs) without reevaluation. The second amended petition alleged two causes of action: 1) challenge to the Department's April 18, 2018 decision to renew the registration of diphacinone without reevaluation and 2) challenge to the Department's

6

November 16, 2018 decision not to reevaluate diphacinone.[3] The first cause of action was dismissed pursuant to the parties' stipulation.

On November 17, 2020, following briefing by the parties and real parties in interest, the trial court heard and denied Raptors' second amended petition. The trial court held that the Department's decision not to reevaluate diphacinone did not constitute an abuse of discretion because the Department's decision was supported by substantial evidence based on the record.

On January 11, 2021, Raptors filed its notice of appeal of the trial court's November 17, 2020 order.[4] On January 14, 2021, the trial court entered judgment in favor of the Department. As the Department notes in its brief, Raptors' notice of appeal was filed prematurely prior to the trial court's entry of judgment. The Department does not contend that the appeal should be denied on this basis. This court, in its discretion, will treat the notice of appeal as having been filed immediately after entry of judgment pursuant to California Rules of Court, rule 8.104(d)(2), and therefore timely.

---

[3] The second amended petition erroneously references the Department's two decisions as April 18, 2019, and November 16, 2019.

[4] Raptors' notice of appeal also included reference to the trial court's May 7, 2019 ruling that sustained the Department's demurrer to the first amended petition and the stipulated dismissal of Raptors' first cause of action in the second amended petition. Raptors' opening brief states that it is only appealing the trial court's holding as to the second cause of action (whether the Department's decision not to reevaluate diphacinone violated CEQA) and that it has elected not to proceed on appeal as to the dismissed first cause of action.

## DISCUSSION

## I.

### *Standard of Review*

In a case that involves a public agency's compliance with CEQA, "the appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 (*Vineyard*).) Like the trial court, our review of the challenged decision for compliance with CEQA "shall extend only to whether there was a prejudicial abuse of discretion." (Pub. Resources Code, § 21168.5.) "Abuse of discretion is established if [the Department] has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (*Ibid*.)

"This statutory language has been interpreted as classifying abuses of discretion into two types of agency error—namely, legal error (the failure to proceed in the manner required by law) and factual error (making findings that are not supported by substantial evidence). [Citation.]" (*POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 710-711.) "Judicial review of these two types of error differs significantly: while we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's substantive factual conclusions." (*Vineyard, supra*, 40 Cal.4th at p. 435.)

Under CEQA, "substantial evidence" means "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions

might also be reached." (Cal. Code Regs., tit. 14, § 15384, subd. (a).)[5]  A reviewing court may not set aside an agency's decision "on the ground that an opposite conclusion would have been equally or more reasonable.  [Citation.]  A court's task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393 (*Laurel Heights*).)  Indeed, a reviewing court has "neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted [it] to do so." (*Ibid*.)

## II.

### *Compliance with Substantive CEQA Requirements*

"CEQA is a comprehensive scheme designed to provide long-term protection to the environment.  [Citation.]  In enacting CEQA, the Legislature declared its intention that all public agencies responsible for regulating activities affecting the environment give prime consideration to preventing environmental damage when carrying out their duties." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112 (*Mountain Lion*).)  In general, CEQA applies to discretionary projects carried out by public agencies (Pub. Resources Code, § 21080, subd. (a).)  CEQA requires a public agency to either prepare an environmental impact report (EIR) where there is substantial evidence that a proposed project will have a significant effect on the environment or adopt a negative declaration where there is no substantial evidence of a significant effect based on the record. (Pub. Resources Code, § 21080, subds. (c), (d).)

---

[5] Title 14, section 15000 et seq. of the California Code of Regulations codifies the regulations under CEQA.

"Pursuant to Public Resources Code section 21080.5, state regulatory programs which meet certain environmental requirements and are certified by the Secretary of the Resources Agency are exempt from some of the usual CEQA requirements. [Citation.] There is no mandate for such programs to prepare initial studies, negative declarations, and EIRs." (*Pesticide Action Network North America v. Department of Pesticide Regulation* (2017) 16 Cal.App.5th 224, 239 (*PANNA*).)

Instead, these programs submit a "plan or other written documentation" in lieu of submitting an EIR in support of certain activities or discretionary projects. (Pub. Resources Code, § 21080.5, subd. (a).) Such a plan or document "serves as a functional equivalent of an EIR." (*Mountain Lion, supra,* 16 Cal.4th at p. 113.) However, as this court has held, the environmental documents prepared by these programs "remain subject to the broad policy goals and substantive standards of CEQA not affected by the limited exemption set forth in section 21080.5, subdivision (c)." (*PANNA, supra,* 16 Cal.App.5th at p. 242.) "The same CEQA guideline which confirms that certified regulatory programs are 'exempt from the requirements for preparing EIRs, negative declarations, and initial studies' immediately explains, 'A certified program *remains subject to other provisions in CEQA* such as the policy of avoiding significant adverse effects on the environment where feasible.' (Cal. Code [R]egs., tit. 14, § 15250, italics added.)" (*PANNA* at p. 241.)

The Department's pesticide registration program is a certified regulatory program under CEQA and governs "[t]he registration, evaluation, and classification of pesticides." (Cal. Code Regs., tit. 14, § 15251, subd. (i)(1).) This certified program is exempt from preparing EIRs under CEQA, but as its own regulations reflect, CEQA requires it to prepare public

reports that include "a statement of any significant adverse environmental effect that can reasonably be expected to occur, directly or indirectly, from implementing the proposal, and a statement of any reasonable measures that are available to minimize significant adverse environmental impact." (§ 6254.) The reports must also "contain a statement and discussion of reasonable alternatives which would reduce any significant environmental impact." (*Ibid*.) The Department's program remains subject to "CEQA's substantive requirements to thoroughly evaluate specific environmental effects before it approves an activity." (*PANNA, supra*, 16 Cal.App.5th at p. 243.)

### III.

### *CEQA's Application to the Department's Decision*

Before turning to the merits of the challenged decision, we first address the Department's argument that CEQA does not apply. Public Resources Code section 21080, subdivision (5) states that CEQA does not apply to "[p]rojects which a public agency rejects or disapproves." The Department argues that its decision not to reevaluate diphacinone falls into this subdivision since it was a decision *not* to do something. In response, Raptors argues that the "project" at issue was not merely the Department's decision not to reevaluate diphacinone, but more broadly its decision to renew the registration for diphacinone without placing it into reevaluation. We find that CEQA applies to the challenged decision.

Under CEQA, a "project" is defined as "the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment" that is undertaken by a public agency. (Cal. Code Regs., tit. 14, § 15378, subd. (a).) "Courts have considered separate activities as one CEQA

11

project and required them to be reviewed together where, for example, the second activity is a reasonably foreseeable consequence of the first activity [citation]; the second activity is a future expansion of the first activity that will change the scope of the first activity's impacts [citation]; or both activities are integral parts of the same project [citation]." (*Sierra Club v. West Side Irrigation Dist.* (2005) 128 Cal.App.4th 690, 698 (*Sierra*).)

The policy behind CEQA mandates "that environmental considerations do not become submerged by chopping a large project into many little ones— each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences." (*Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283-284.) Indeed, "[a] public agency may not divide a single project into smaller individual projects in order to avoid its responsibility to consider the environmental impacts of the project as a whole." (*Sierra, supra*, 128 Cal.App.4th at p. 698.)

The Department contends that Raptors waived any challenge to the Department's renewal decision since the only issue raised in Raptors' opening brief was the Department's November 16, 2018 decision not to reevaluate diphacinone challenged in its second cause of action.[6] The Department further argues that even if we were to consider renewal and reevaluation as part of one project, "CEQA does not impose separate requirements on the annual renewal decisions," an argument it bases on *CATS, supra*, 136 Cal.App.4th 1049. We do not find these arguments persuasive.

---

[6] The second amended petition originally included a first cause of action that challenged the Department's April 18, 2018 decision to renew the registration of diphacinone without reevaluation. The parties stipulated to dismiss this cause of action based on the holding in *CATS, supra¸* 136 Cal.App.4th 1049, 1066 (that the decision to reevaluate a pesticide is not tied to the 60-day *renewal period*) while preserving Raptors' right to appeal the dismissal of this cause of action.

First, the record reflects that the Department's November 16, 2018 decision not to reevaluate diphacinone was not an isolated activity but resulted from the Department's proposed decision to renew its registration for 2018 and Raptors' December 22, 2017 responsive request that the Department reevaluate that and other rodenticides. Raptors supplemented its request with additional information over the next several months. The Department's own regulations demonstrate the connection between renewal and reevaluation, requiring that, "when renewing a pesticide registration without a reevaluation, [the Department "shall"] make a written finding that [it] has not received sufficient information necessitating reevaluation pursuant to Sections 6220 and 6221." (§ 6215, subd. (c).) The Department made such a finding in its April 2018 Final Decision.

The Department's response to Raptors' request for reevaluation in March 2018 further demonstrates the relationship. It stated it was "in the process of reviewing data submitted by the California Department of Fish and Wildlife and wildlife organizations" and would be proceeding with renewal of the rodenticides without placing them into reevaluation at this time. The Department confirmed this in its "Final Decision Regarding *Renewal* of Registration of Pesticide Products for 2018" that was published on April 18, 2018. (Italics added.) Raptors challenged this decision under its now dismissed first cause of action. On November 16, 2018, the Department further responded to Raptors that it had completed its investigation in response to Raptors' December 2017 request and would be placing SGARs into reevaluation, but not FGARs, which include diphacinone. This decision was accompanied by a 35-page investigation report.

The foregoing shows that the Department's ultimate decision not to reevaluate diphacinone was connected to its renewal decision. Pursuant to

section 6253, on November 17, 2017, the Department posted its notice of proposed decision to renew pesticide registrations for 2018 for at least 30 days for public review and comment. Raptors submitted its comments within this 30-day timeframe that included a request that diphacinone be reevaluated based on the significant risk its continued use posed to wildlife.

Pursuant to section 6215, subdivision (b), the Department renewed the registration for diphacinone within 60 days of receiving a completed renewal application. The Department did not and was not required to make a decision as to reevaluation within this limited 60-day period and could instead "initiate reevaluation once it has completed its review of all available evidence." (*CATS*, *supra*, 136 Cal.App.4th at p. 1066.) In *CATS,* the court emphasized that the Department was not required to make a rushed decision regarding reevaluation but could initiate reevaluation after it had an opportunity to review all the scientific evidence before it. (*Ibid.*) This underscores the importance of reevaluation to the Department's substantive assessment of a pesticide's environmental impact and continued use.

Accordingly, here, following renewal, the Department continued its review and investigation pursuant to Raptors' original request. In November 2018, it notified Raptors that it had completed its investigation and would not be reevaluating diphacinone. We view this not as a disapproval of a project but as the Department's approval of the continued use and sale of this rodenticide. The Department in essence, was affirming the earlier finding it made at renewal that it had not received sufficient evidence to show it should undertake reevaluation. (§ 6215, subd. (c).)

This case is distinguishable from *Main San Gabriel Basin Watermaster v. State Water Resources Control. Bd.* (1993) 12 Cal.App.4th 1371 (*San Gabriel*), the main case cited by the Department to support its position that

14

CEQA does not apply to project disapprovals.  In *San Gabriel*, the court held that CEQA review did not apply to a public agency's disapproval of a landfill expansion project.  The court reasoned that the Legislature "evidently concluded that public agencies should not be forced to commit their resources to the costly and time-consuming environmental review process for proposed private development projects slated for rejection, whatever the reason for agency disapproval." (*San Gabriel*, at p. 1384.)  Here, by contrast, the project at issue is not development or construction proposed by a private individual, but a request for the Department, a public agency, to reevaluate a rodenticide that it originally approved for sale and use in California.  Again, the Department's own regulations acknowledge its obligations to scrupulously evaluate pesticides before they are registered and then to continuously monitor whether reevaluation is warranted in response to new information.

Based on the foregoing, we interpret the project or "the whole of [the] action" to encompass both the Department's decision to renew the registration of diphacinone and its decision not to reevaluate diphacinone in response to Raptors' request.  These are related decisions that ultimately resolve one question:  whether the continued, unrestricted use of diphacinone is warranted given its potential adverse impact on the environment.  This interpretation furthers CEQA's substantive policy that certified regulatory programs must avoid "significant adverse effects on the environment where feasible." (Cal. Code Regs., tit. 14, § 15250.)  To hold otherwise would mean that only the Department's decision to re-evaluate a pesticide could be challenged while a decision declining re-evaluation would be insulated from CEQA, despite the greater potential for significant adverse environmental effects from a decision of the latter kind.

15

The Department argues that CEQA does not apply to its annual renewal decisions based on the holding in *CATS*, *supra*, 136 Cal.App.4th 1049. There, the court held that the Department was not required "to make a hasty decision regarding possible reevaluation of a pesticide by tying reevaluation to the 60-day time frame of annual renewal. Revaluation can take place at any time and is not linked in any way to annual renewal." (*CATS*, at p. 1066.) As discussed above, we view the decision in *CATS* as highlighting the importance of reevaluation by not limiting it to the 60-day time frame for renewal.

In *PANNA*, *supra*, 16 Cal.App.5th 224, the Department made a similar argument before this court—that its pesticide registration program was exempt from CEQA's substantive requirements based on the holding in *CATS*. This court disagreed and held that "[*CATS*] concerned a CEQA challenge related to the Department's procedure for annually reviewing registered pesticides and whether the Department had to annually reopen the review for public comment as part of the renewal process." (*PANNA,* at p. 242.) The *CATS* court did not address CEQA's substantive requirements governing the substance of the Department's environmental review and does not stand for the proposition that the Department is exempt from those requirements. (*PANNA,* at p. 242.)

As in *PANNA*, here, the challenge does not involve the timing or procedure governing the Department's renewal and reevaluation process; instead, it raises the question whether the Department's environmental review of diphacinone satisfies CEQA's *substantive* mandate. *PANNA*, not *CATS,* governs the applicability of CEQA here.

***There Was Prejudicial Abuse of Discretion by the Department.***

We now turn to Raptors' substantive arguments that there was a prejudicial abuse of discretion by the Department. "Abuse of discretion is established if the [Department] has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (Pub. Resources Code, § 21168.5.) Raptors contends that the Department committed the following legal errors in its decision not to reevaluate diphacinone: 1) the Department failed to perform a cumulative impacts analysis under CEQA; and 2) the Department's investigation report failed to disclose accurate and complete information. These claimed legal errors are reviewed de novo. (*Vineyard, supra*, 40 Cal.4th at p. 435.)

## A. Cumulative Impacts Analysis

"A substantive CEQA requirement is the assessment of a project's cumulative impacts on the environment. This concept considers the incremental effect a proposed approval may have when viewed in connection with past, current or future approved projects." (*PANNA, supra*, 16 Cal.App.5th at p. 248.) "Cumulative impacts" is defined as "two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts." (Cal. Code Regs., tit. 14, § 15355.)

In every case, a public agency is required "to make at least a preliminary search for potential cumulative environmental effects, and, if any such effect were perceived, at least a preliminary assessment of its significance." (*Laupheimer v. State of California* (1988) 200 Cal.App.3d 440, 462-463 (*Laupheimer*).) While " 'technical perfection' " is not required, "the cumulative impact analysis must be substantively meaningful." (*Joy Road Area Forest & Watershed Assn. v. California Dept. of Forestry & Fire*

*Protection* (2006) 142 Cal.App.4th 656, 676.) This includes "adequacy, completeness, and a good faith effort at full disclosure." (Cal. Code Regs., tit. 14, § 15151.) A public agency's failure to consider cumulative impacts constitutes a prejudicial abuse of discretion. (*Environmental Protection Information Center, Inc. v. Johnson* (1985) 170 Cal.App.3d 604, 625.)

"A cumulative analysis which understates information concerning the severity and significance of cumulative impacts impedes meaningful public discussion and skews the decisionmaker's perspective concerning the environmental consequences of the project, the necessity for mitigation measures, and the appropriateness of project approval." (*Citizens to Preserve the Ojai v. County of Ventura* (1985) 176 Cal.App.3d 421, 431.) For example, in *Laupheimer, supra,* 200 Cal.App.3d 440, the court found that the Department of Forestry failed to perform a sufficient analysis of the cumulative impacts of a timber harvesting plan, including the increased risks of causing landslides and runoff damage in areas beyond the logging site. The court criticized the Department of Forestry's "approach" as "minimiz[ing] the adverse effects of logging operations on the 28 Plan site itself, and . . . assum[ing] that such minimization would sufficiently mitigate offsite impacts of whatever kind. Such an approach was expressly rejected as 'at odds with the concept of cumulative effect, which assesses cumulative damage as a whole greater than the sum of its parts.' " (*Id.* at p. 466.)

Here, Raptors argues that the Department's decision improperly relied on a comparative analysis of the effects of FGARs versus SGARs, instead of a cumulative analysis that considers the incremental effect of diphacinone when used in addition to other anticoagulant rodenticides over time. Raptors contends that this lack of a cumulative impacts analysis constitutes an abuse of discretion by the Department. We agree.

18

Although Raptors' original request for reevaluation included seven rodenticide products (three FGARs and four SGARs), the Department was obligated under CEQA to perform a cumulative impacts analysis as to each of these rodenticides, including diphacinone. (*PANNA, supra,* 16 Cal.App.5th at pp. 249-250.) This includes an analysis of each rodenticide's prevalence, toxicity, effect on non-target wildlife, and the effect of its interaction with other rodenticides (like brodifacoum) on non-target wildlife. The Department's 35-page report contains no discussion of the cumulative impacts resulting from the combination of diphacinone with other rodenticides present in the environment, but instead focuses on the *relative* toxicity and effects of FGARs compared to those of SGARs.[7] This is so despite the fact that, with respect to mammals, diphacinone was shown to have a toxicity value only second to brodifacoum (an SGAR). In the Department's letter notifying Raptors of its decision, the Department states that it "has decided not to reevaluate FGARs at this time" because its "investigation of the reported impacts found that the rate of FGAR exposure among non-target wildlife is generally decreasing and is lower than for SGARs."

After discussing the various data and studies that were submitted by Raptors' counsel, the Department stated in its investigation report that it found FGARs to be less toxic, less persistent, and less bioaccumulative than SGARs. Based on this, the Department concluded that "current uses of FGARs are unlikely to have a significant adverse impact to non-target wildlife." Put differently, the Department concluded that because FGARs as a class posed less risk than SGARs as a class, FGARs were unlikely to have a significant adverse impact. What is lacking is any consideration of the effects

---

[7] The investigation report makes no mention of "cumulative impacts" at all.

19

of diphacinone in particular, including any cumulative or incremental impacts resulting from its continued use in addition to the use and effects of other approved rodenticides in the environment. The Department thus failed to consider the cumulative impacts it was required to consider under CEQA.

The importance of a cumulative impacts analysis stems from the fact that damage to the environment often occurs incrementally from various small projects. In *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 720, the court found that an EIR that focused on "the ratio between the project's impacts and the overall problem" did not adequately assess the project's cumulative impacts. The court held that "the standard for a cumulative impacts analysis is defined by the use of the term 'collectively significant' in Guidelines section 15355 and the analysis must assess the collective or combined effect of energy development. The EIR improperly focused upon the individual project's relative effects and omitted facts relevant to an analysis of the collective effect this and other sources will have upon air quality." (*Kings County,* at p. 721.)

Similarly, here, the Department did not assess diphacinone's cumulative or incremental effect on non-target wildlife in conjunction with the effects of other anticoagulant rodenticides over time. (See *PANNA, supra,* 224 Cal.App.5th at p. 248.) Instead, it concluded that reevaluation of FGARs was not warranted since FGARs were found to be less toxic and persistent than SGARs. However, in exercising its regulatory functions, the Department was required to consider each rodenticide "in its full environmental context and not in a vacuum." (*Laupheimer, supra,* 200 Cal.App.3d at p. 462.)

The Department's report focuses on FGARs and SGARs as two broad categories of rodenticides, and seemingly minimizes the adverse effects of

20

FGARs as a whole by comparing them to the more severe effects of SGARs. This ignores the unique attributes and risks of diphacinone and more importantly does not inform the reader of the potential adverse effects of continued diphacinone use when considered in addition to the other rodenticides circulating in the environment. This is precisely what CEQA was designed to guard against; small projects or decisions that cumulatively could have significant consequences on the environment.

The studies submitted to the Department discussed the use and prevalence of diphacinone. For example, as summarized in the investigation report, in a 16-year study of urban bobcats in Los Angeles, diphacinone was detected in approximately 30% of the blood samples tested and 40% of the liver samples tested. It was the most frequently detected FGAR, despite having a shorter half-life than any of the SGARs. The report further found that, with the exception of bromadiolone, more diphacinone was sold and used than any other rodenticide in 2016.

The Department argues that the urban bobcat study is not significant since it did not find a positive association between diphacinone exposure and mange in bobcats. However, in the comments by one of the study's authors that was submitted to the Department, the author notes that FGARs are not detected "as frequently in liver samples because they have much shorter half-lives than the second-generation compounds." The author goes on to conclude that "[o]ne of our significant findings using this method is that we learned we have been underestimating wildlife (or at least bobcat) exposure to first-generation anticoagulants by relying solely on liver samples to do the testing." Although this does not mean that there is in fact a positive association between diphacinone exposure and mange, it obligated the

21

Department to at least meaningfully consider the cumulative effects of diphacinone given its prevalence and bioaccumulation in non-target wildlife.

Finally, even if the Department deemed concerns over the cumulative effect of continued use of diphacinone to be "too remote and speculative to be significant," at the very least it should have "made the administrative record show the requisite consideration." (*Laupheimer*, *supra*, 200 Cal.App.3d at p. 467.) The Department was obligated "to make at least a preliminary search for potential cumulative environmental effects, and, if any such effect were perceived, at least a preliminary assessment of its significance." (*Id*. at pp. 462-463.) Even if the cumulative impacts of diphacinone were not readily apparent from the information the Department received, it still had to state this conclusion and explain how it was reached. (See *PANNA*, *supra*, 16 Cal.App.5th at p. 250.) The Department did not do either but instead concluded that diphacinone did not warrant reevaluation because FGARs as a class are less problematic than SGARs.

## B. Inaccurate Disclosure of Information

Raptors next argues that the Department committed separate legal errors under CEQA by failing to disclose accurate and complete information in various portions of its decision and investigation report.

### 1. *The Department's Discussion of Diphacinone with Other FGARs and Conclusion of a "General Downward Trend in FGAR Exposure Rates" Constituted Informational Deficiencies.*

Raptors argues that the Department's investigation report "failed as a CEQA informational document" because 1) it discussed diphacinone together with other less harmful FGARs rather than by itself; and 2) its statement concerning " 'a general downward trend in FGAR exposure rates' " was misleading. The Department argues that Raptors did not raise these arguments before the trial court. Although Raptors did not raise these exact

arguments below, it did argue that it was an error for the Department to compare the relative effects of FGARs and SGARs because such an approach disregards the impact of diphacinone as an individual rodenticide and as a contributing factor affecting the environment. This argument is adequately related to the informational deficiency issues Raptors now raises, as they all stem from the Department's failure to evaluate the effects of diphacinone individually.

Even if Raptors did not adequately raise these issues below, we exercise our discretion and decide these questions of law on appeal, especially since they involve issues of public interest. (*POET, LLC v. State Air Resources Bd., supra*, 218 Cal.App.4th 681, 750-751.) We find that based on the Department's failure to perform a cumulative impacts analysis, its investigation report also fails as an accurate informational document because, by grouping diphacinone together with other FCARS, it fails to provide "for intelligent weighing of the environmental consequences of the project." (*City of Santee v. County of San Diego* (1989) 214 Cal.App.3d 1438, 1455.)

The issue here was not whether the Department should reevaluate FGARs as a group of rodenticides, but whether it should reevaluate *any* of the individual rodenticides, including diphacinone, as requested by Raptors. By discussing the effects and trends surrounding FGARs as a group, the Department did not accurately inform the public of the "significant adverse environmental effect that can reasonably be expected to occur, directly or indirectly" from continuing to allow diphacinone to circulate in the environment. (§ 6254.) As discussed above, diphacinone was the most frequently detected FGAR in liver and blood samples collected from the urban bobcat study and has a higher toxicity than three of the four SGARs.

23

Although the Department's statement that "there is a general downward trend in FGAR exposure rates" may be supported by the data, it missed the mark because it failed to inform the public as to the effects of diphacinone. Based on its prevalence and toxicity, diphacinone is more akin to an SGAR and its adverse effects were obscured by the Department's grouping of it with other less prevalent and toxic FGARs.[8]

## 2. *The 1980 Owl Study*

Raptors contends that the Department's discussion of a 1980 owl study was misinformative and undermined CEQA's basic information disclosure purposes. This study was one of several studies summarized in a 2004 document by the EPA that assessed rodenticide risks in birds and non-target mammals. The principal study examined the effects of several FGARs and SGARs on 36 barn owls. The EPA wrote in its 2004 document that "[s]ix of the 18 owls exposed to second-generation anticoagulants died, whereas none of the 6 owls offered first-generation anticoagulant-poisoned rats exhibited any signs of intoxication." The Department summarized this 2004 EPA document in its investigation report and stated, with respect to this study, that "[t]here were no mortalities and no observed sublethal effects in any of the owls fed rats exposed to FGARs."

---

[8] For example, mammals are more sensitive to diphacinone (or in other words, it is more toxic for them) than either of the other FGARs and any of the four SGARs except brodifacoum. The absorption rate for diphacinone is also higher than either of the other FGARs and is the same as one of the three SGARs. The same is true for exposure rates among non-target wildlife; diphacinone's exposure rate is higher than that of either of the other two FGARs and higher than one of the SGARs. Finally, the data available indicates there is higher usage of diphacinone than of any other FGAR or SGAR, and the second highest usage is of an SGAR (bromadiolone).

Raptors argues that the Department's above statement was inaccurate because the 1980 study had also included a preliminary trial in which four owls were fed diphacinone-killed mice. All four owls "displayed anticoagulant poisoning, and 3 died from massive hemorrhaging."[9] We do not find that the Department erred in its summary. Both the EPA and the Department accurately summarized the study's principal experiment, and both discussed the study's findings as to barn owls—the subjects of the principal experiment. Raptors does not contend that the summary of this principal study was incorrect, only that the Department failed to reference the outcome of the study's preliminary trial. The EPA's 2004 document itself does not reference the preliminary trial, and Raptors does not provide any support that the omitting reference to such preliminary trials constitutes a violation of CEQA.

Lastly, Raptors argues that the Department's use of this old owl study was misleading because it dismissed current science. We do not find this argument persuasive. As the Department states in its brief, it discussed this study in its report to further support its position that SGARs generally posed greater risks than FGARs. However, the Department also considered and discussed numerous other more recent data and studies, including 2015 and 2018 studies on bobcats and a 2015 study on coyotes.

### 3. *The 2015 Bobcat Study*

Raptors next argues that the Department's discussion of the 2015 bobcat study was misinformative and did not comport with CEQA. This was a 16-year study of anticoagulant rodenticide exposure in urban bobcats. In discussing the study's findings in an email to the National Park Service, one of the study's authors noted that among the liver samples tested, they "most frequently detected second-generation compounds brodifacoum and

---

[9] The four owls used in the preliminary trial were not barn owls.

bromadiolone." The study's author also stated that they "have not found an association between mange and [FGARs]." However, the author explains that "because we underestimate first-generation anticoagulant exposure when we test liver samples, a lack of association between mange and first-generation anticoagulants could potentially be driven by a bias in the shorter tissue half-life of first-generation compounds compared to second-generation compounds."

In its report, the Department discussed this study in detail and then later stated that this study "found statistically significant associations between SGARs and mange, but not between FGARs and mange." The Department included this statement to support its conclusion that SGARs were more toxic than FGARs. Raptors argues that this conclusory statement effectively "dismissed the significant diphacinone implications" from this study. This includes the study's findings that diphacinone was the third most prevalent anticoagulant compound detected in liver samples and was detected in blood samples three times more frequently compared to SGARs.

The Department's focus on a comparative analysis of FGARs and SGARs undoubtably influenced what it chose to highlight from the 2015 study's findings. As we discussed above, the Department erred in not performing a cumulative impacts analysis. Had it done so, perhaps it would have focused more on the study's findings as to diphacinone and its exposure rate in bobcats. However, we do not find that the Department's statement constituted a legal error, as the study's author herself stated it did not find an association found between mange and FGARs. She hypothesized that the lack of association *could potentially* be driven by a bias in the shorter tissue half-life" of FGARs compared to SGARs. Raptors argues that because diphacinone was commonly detected in the samples tested, it must have

cumulatively contributed to mange along with the SGARs that were detected. This finding was not made in the study. Given this, we do not find the Department's statement to be incorrect or misleading.

### C. Substantial Evidence

Lastly, Raptors argues that even under the substantial evidence standard, which Raptors argues should not be applied here, the challenged decision still constitutes a violation of CEQA. The substantial evidence standard is a more deferential standard where all reasonable doubts are resolved in favor of the agency's decision. (*Laurel Heights, supra,* 47 Cal.3d at p. 393.)

Raptors contends that there was no substantial evidence to support the Department's decision based on the same arguments it had made to support the contention that the Department committed legal error. Since we were asked to determine whether there was a prejudicial abuse of discretion based on legal error and did find legal error in the Department's lack of a cumulative impacts analysis, we need not analyze the Department's decision under the substantial evidence standard.

## DISPOSITION

The judgment denying Raptors' petition for writ of mandate is reversed. The judgment is remanded to the superior court with instructions to issue a writ of mandate directing the Department to reconsider its decision not to place diphacinone into reevaluation after it performs a cumulative impacts analysis. On remand, the Department should analyze the particular characteristics of diphacinone that are relevant to assessing its impact on the environment. This includes a discussion, to the extent there is available information or data, on diphacinone's prevalence, toxicity, effect on non-target wildlife, and the effect of its interaction with other rodenticides on

non-target wildlife. The Department's analysis should not minimize any adverse effects of diphacinone by grouping it with FGARs in general or by comparing the relative effects of FGARs versus SGARs. Raptors shall recover its costs on appeal.

_____
STEWART, J.

We concur.


_____
RICHMAN, Acting P.J.



_____
MAYFIELD, J. *




*Raptors Are the Solution v. Cal. Dept. of Pesticide Regulation* (A161787)

_____

\* Judge of the Mendocino Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.