Filed 4/26/23  In re G.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re G.M., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>G.M. et al.,<br><br>        Defendants and Appellants. | E079836<br><br>(Super.Ct.No. RIJ2200408)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Cheryl C. Murphy, Judge.  Affirmed.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant G.M.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant S.M.

1

Minh C. Tran, County Counsel, and Teresa K.B. Beecham and Prabhath Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

G.M. (mother) and S.M (father) appeal from orders asserting dependency jurisdiction over their daughter G.M. (G.), leaving her in their custody, and ordering family maintenance services.

When G. was eight or nine, she was sexually abused by the maternal grandfather, who lived in the home. Around the same time, she developed anxiety and emetophobia — fear of vomiting. She disclosed the sexual abuse to her mother a year later, by which point it had stopped. When she was 13, however, she called a rape crisis hotline and reported the sexual abuse. The hotline notified the police and the Department of Public Social Services (Department) — hence this dependency.

The juvenile court found jurisdiction under Welfare and Institutions Code section 300, subdivision (b)[1] (failure to protect from a substantial risk of serious physical harm) and subdivision (d) (sexual abuse), in that G. had been sexually abused and the parents had failed to protect her from sexual abuse. It further found jurisdiction under subdivision (b), in that the parents had failed to obtain mental health services for G.

The parents contend that there was insufficient evidence to support these jurisdictional findings.

---

**1** All further statutory citations are to the Welfare and Institutions Code, unless otherwise specified. All further citations to an undesignated subdivision are to subdivisions of section 300.

We will hold that there was substantial evidence to support the finding of sexual abuse, simply because G. had, in fact, been sexually abused. The parents contend that there also had to be evidence that they failed to protect her from sexual abuse. Even if so, the juvenile court could reasonably find that, once the sexual abuse was disclosed to them, they did, in fact, fail to protect her from a risk of future sexual abuse. Finally, we will also hold that there was substantial evidence to support the finding that the parents' failure to obtain therapy for G. posed a substantial risk of serious physical injury to her, in the form of suicide, cutting, and/or anorexia.

I

STATEMENT OF FACTS

A.    *Preface*.

The evidence at the jurisdictional/dispositional hearing consisted of three social workers' reports, plus the oral testimony of the mother, the current social worker, and the supervising social worker. We confine our consideration to that evidence, which showed the following.

B.    *G.'s Call to a Rape Crisis Hotline*.

The parents were married; they lived together with G. and their son, M.M. (M.). When this dependency was filed, G. was 14 and M. was 12. The family lived with the mother's parents, F.P. (F.) and R.P. (R.), who owned the home.

In February 2022, G. phoned a rape crisis hotline. She said she wanted counseling because her grandfather had raped her when she was eight years old. She was still living

3

with him.  She felt safe in the home, except that she "felt unsafe when she was near [him]."  Recently, she had told her parents about it.  They did not report it to anyone.  She said "she did not want to get her grandfather or parents in any trouble."  "She . . . felt confused because she did not know what to do next, especially because F[.] is the head of their household."

The police were notified; they responded to the home.  However, they concluded that G. was "safe in the home at th[e] time."

C.    *Initial Interviews*.

The Department was also notified.  In response, a social worker interviewed members of the family.

G. said that, when she was eight, F. "touched her thighs, buttocks, and breast.  He also put his mouth on her vagina."  This happened "more than once over a period of a week and a half" but did not happen again after that.

At nine, G. stopped eating and had to be hospitalized for malnutrition.  She was diagnosed as having anxiety; she believed she also had emetophobia (fear of vomiting).  After she was released from the hospital, she saw a therapist, but only once; she did not discuss the sexual abuse with the therapist.  G. also had "had a history of self-harm (cutting) and thoughts of suicide."

About a year after the sexual abuse, G. told the mother about it.  The mother told her later that she had gotten angry and yelled at F.  "[A] few years ago," G. reported, she and the mother also told R.  At that point, G. "was asked if she wanted the police called

4

or to have the maternal grandfather leave, and she stated no." Recently, G. had also told the father.

G. said she felt safe in the home. She said "she 'loves and hates' [F.] for what happened but she did not want him to leave the home."

M. also said he felt safe in the home and that no one made him feel "uncomfortable."

The mother confirmed that G. had anxiety and emetophobia, which had started when she was eight or nine. She denied knowing what could have caused G.'s anxiety. The father denied having known anything about the sexual abuse until the police told him. The parents agreed to a safety plan that G. would never be left alone with F. At the request of the police, the social worker did not interview the maternal grandparents.

D.       *March Social Worker's Visit.*

In March, the social worker made an unannounced home visit.

The father and G. both said the family was adhering to the safety plan. G. said she had not started seeing a therapist for the sexual abuse because of the parents' work schedule. The social worker suggested therapy via Zoom. The mother "agreed to make an appointment and ensure the child attends."

The mother did not want to discuss the sexual abuse allegations. When pressed, however, she admitted that, when G. was nine, she told her that F. "would have her sit on his lap, he would touch her stomach when she was ill, and he would kiss her on the lips, which made her uncomfortable." When the mother confronted F., he admitted touching

5

G.'s stomach when she was ill, but he denied the other allegations. She told him not to hug G., kiss G., or have G. sit on his lap. She asked G. if she wanted F. prosecuted, and G. said no.

Around November 2021, G. had gone "into more details." She said F. "hugged her too tight," "dance[d] with her by putting her feet on top of his," and "kiss[ed] her on the lips." According to the mother, G. did not disclose any oral copulation. R. offered to "kick [F.] out" or to let G.'s family move out, but G. did not want either. The mother later testified that, after that, she never left G. alone with F. She also put a lock on G.'s door.

E.      *April Social Worker's Visit.*

In April, the social worker made another unannounced home visit. G. said again that she felt safe in the home. She had not started therapy yet. According to the mother, G. had completed a mental health evaluation and had made an appointment to start Zoom therapy; however, the therapist had missed the call. She said she was going to make another appointment.

The police gave the social worker permission to interview the maternal grandparents. F. denied any inappropriate touching. R. said that, two or three years earlier, the mother and G. told her that when G. was 8, F. "had touched and kissed G[.] on the chest and private area." R. said she did not want to believe it, but she also wanted to protect G. She offered to move out, but G. did not want that. When R. talked to F. about the allegations, he denied them.

6

F.    *The Decision to File the Dependency*.

By May, the social worker had become concerned about the fact that G. and F. were sharing a home.  She believed that "G[.] living with the person who[] abused her daily is traumatizing."  She asked the mother if either the family could move out or the maternal grandparents could move out.  The mother objected that the family could not afford to do so, that there had been no incidents since G. was eight or nine, and that G. would be upset and "have a panic attack."  However, she agreed to talk to the father about it.

The social worker also brought up the fact that G. was not yet in therapy.  The mother responded that "she thought therapy was an option and not a requirement."

Ten days later, the mother told the social worker that the family was financially unable to move, adding again that G. did not want to move and did not want F. to move.  G. continued to say that "she was doing well and felt safe."

At that point, the Department detained G. and filed a dependency petition regarding both children.

Immediately after the detention, at the mother's behest, F. moved out.  The juvenile court continued the detention hearing so the Department could confirm this.  The Department did confirm it, so at the continued detention hearing, the juvenile court returned G. to the parents' custody.

G.      *June Social Worker's Visit.*

In June, the supervising social worker made a home visit.  G. and M. both said they felt safe in the home.  G. said her parents were "supportive."  "My family is fine. . . . I don't think anything is wrong."

The mother said she "doubt[ed]" the sexual abuse allegations, and she did not want to believe them, but she also said, "I have to believe my daughter."  She said the removal had been traumatic for G.  "She is having nightmares of being taken again."  The father said "G[.] is anxious when strangers come to the door, as she feels she will be removed from the home."

G. was under the care of both a psychiatrist and a therapist.  After the removal, she was diagnosed with dissociative disorder and started taking escitalopram (Lexapro).

The supervising social worker told the mother that, if G. saw F. at a family event, such as a wedding or a funeral, that would be all right, as long as another adult was present.

H.      *July Social Worker's Visit.*

In July, the social worker made an unannounced home visit.  G. was still seeing her therapist.  She said she felt safe at home.  She did not understand why she had been detained; she felt she might be detained again, and she felt "triggered" whenever the doorbell rang.

F. was still out of the home.  However, G. said "he is at family events and her parents are supervising her there."  The mother confirmed this.

8

I. *Testimony at the Jurisdictional/Dispositional Hearing*.

According to the mother, the social worker had initially presented therapy as "an option. . . . [I]f [G.] wanted to [go], she could," but G. had refused to go. Once the social worker said therapy was "mandatory," the mother had G. start therapy "right away."

According to the mother, G. first saw a therapist in April. (However, she may have been referring to the mental health evaluation.) In May, G. started with a new therapist, but they did not have a good rapport. She started seeing a third therapist in June and had been seeing her for five or six weeks. The mother was willing to keep G. in therapy without court involvement or, if necessary, under a voluntary case plan.

G. was "scared that [the Department was] going to take her away": "She has nightmares. She has panic attacks when she hears the doorbell ring. . . . When there's a car just pulling into the driveway trying make a U-turn, she cries and screams. She locks her door at night so nobody can get in because she's scared they are going to take her again."

According to the mother, G. had seen F. at only one family function — a two or three-day event in Laughlin, Nevada. The mother did not know in advance that F. was going to be there. They stayed at separate locations, and G. was supervised.

II

STATEMENT OF THE CASE

In May 2022, the Department detained G.; it then filed a dependency petition regarding both children. The petition alleged failure to protect (subd. (b)), sexual abuse (subd. (d)), and — solely as to M. — abuse of a sibling (subd. (j)).

Specifically, as to G., it alleged:

Allegations b-1 and d-1: "While in the care and custody of the parents, [G.] was sexually abused by her maternal grandfather, in that he put his mouth on her vagina, touched her on her thighs, buttocks, and breast, and he would kiss the child on the lips while she would sit on his lap."

Allegations b-2 and d-2: "The child disclosed being sexually abused by the maternal grandfather and the parents failed to intervene or protect the child."

Allegation b-3: "The parents neglected the child's mental health needs, in that the parents ha[ve] failed to maintain mental health services for the child to address the child's sexual abuse, anxiety, emet[o]phobia, self-harming, and history of thoughts of suicide."

In August, at the jurisdictional/dispositional hearing, the juvenile court found the allegations of the petition as to G. true. It explained:

"This Court is concerned that, really, the minor, G[.], was advocating for herself at a time when the parents should have been advocating for her and should have taken more proactive steps in this situation by either moving out of the home of the grandparents or

10

requesting that the grandfather leave the home and also to get G[.] immediately in counseling.

"This Court is concerned that those types of steps were not taken until the Department became involved, the Court became involved. And if, in fact, G[.] had not been removed from the parents' home, the likelihood is the parents would have continued to remain in that home and G[.] would have continued to suffer severe trauma by being in the presence of the perpetrator of the sexual abuse."

It dismissed the petition as to M. It left G. in the parents' custody and ordered family maintenance services. It also ordered that G. have no contact with F.

III

THE SUFFICIENCY OF THE EVIDENCE

TO SUPPORT THE JURISDICTIONAL FINDINGS

The parents contend that the jurisdictional findings were not supported by substantial evidence.

A.    *Legal Background*.

Under subdivision (b)(1)(A), the juvenile court has jurisdiction based on failure to protect when: "The child has suffered, or there is a substantial risk that the child will

11

suffer, serious physical harm or illness, as a result of . . . : [¶] (A) The failure or inability of the child's parent . . . to adequately supervise or protect the child."[2]

Under subdivision (d), the juvenile court has jurisdiction based on sexual abuse when: "The child has been sexually abused, or there is a substantial risk that the child will be sexually abused, . . . by the child's parent . . . or a member of the child's household, or the parent . . . has failed to adequately protect the child from sexual abuse when the parent . . . knew or reasonably should have known that the child was in danger of sexual abuse."

There is a split of opinion as to whether jurisdiction under subdivision (b)(1) can be based on past harm alone, or whether, on the other hand, it requires a risk of harm in the future. (Compare *In re G.Z.* (2022) 85 Cal.App.5th 857, 877; *In re Emily L.* (2021) 73 Cal.App.5th 1, 15; with *In re Adam D.* (2010) 183 Cal.App.4th 1250, 1261; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1434-1438.) The argument that it requires a risk of future harm is supported by the further provision that "[t]he child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness." (Subd. (b)(3).)

We need not decide this point. Here, G. had been sexually abused, but she had not suffered any *serious physical* harm in the past. (Cf. *People v. Caudillo* (1978) 21 Cal.3d

---

**2**     The version of section 300 that was in effect in 2022 was formatted differently, but it was not substantively different in any relevant respect. (Former § 300, Stats. 2021, ch. 98, § 1.)

12

562, 587 [rape, oral copulation, and sodomy, standing alone, do not constitute great bodily injury], disapproved on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 229 and *People v. Escobar* (1992) 3 Cal.4th 740, 749-751.) On these facts, jurisdiction under subdivision (b)(1) had to be established, if at all, by a substantial risk of serious physical harm in the future.

By contrast, subdivision (d) applies where "[t]he child has been sexually abused, *or* there is a substantial risk that the child will be sexually abused . . . ." (Italics added.) Unlike subdivision (b)(3), it has no provision that the dependency must be terminated if the child no longer needs protection. Accordingly, it has been held that the first prong of subdivision (d) — "[t]he child has been sexually abused" — does not require evidence of a current risk. (*In re Carlos T.* (2009) 174 Cal.App.4th 795, 803-804.)

The father asserts that section 300 *as a whole* requires a risk of harm at the time of the jurisdictional hearing. However, two of the cases that he cites involved subdivision (b). (*In re A.S.* (2011) 202 Cal.App.4th 237, 240, 244, disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7; *In re Rocco M.* (1991) 1 Cal.App.4th 814, 817, 824, disapproved on other grounds in *In re R.T.* (2017) 3 Cal.5th 622, 627-633.) The third held that the juvenile court had jurisdiction based on the father's sexual abuse of the children, *regardless* of whether the mother failed to protect them from it; it went on to discuss the mother's failure to protect only because it was "relevant to other issues that she raises in her appeal . . . ." (*In re Maria R.* (2010) 185

13

Cal.App.4th 48, 60, disapproved on other grounds in *In re I.J.* (2013) 56 Cal.4th 766, 780-781.)

Jurisdiction need only be proven by a preponderance of the evidence. (§ 355, subd. (a); *In re J.S.* (2021) 62 Cal.App.5th 678, 685.)

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] '"[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]."' [Citation.]" [Citation.]' [Citation.]" (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

"'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged

14

statutory grounds for jurisdiction are supported by the evidence.' [Citation.]" (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

B.     *The d-1 Allegation*.

All of the allegations (other than the b-3 allegation; see part III.C, *post*) were based on sexual abuse by F. However, jurisdiction under subdivision (b)(1) requires proof of an additional element that jurisdiction under subdivision (d) does not — namely, a current risk. We therefore focus on subdivision (d).

Similarly, allegation d-1 stated that F. had sexually abused G.; allegation d-2 additionally stated that, once G. disclosed the sexual abuse, the parents failed to protect her. We therefore focus, at least for now, on allegation d-1.

It is undisputed that F.'s acts of orally copulating and sexually touching G. when she was eight constituted sexual abuse. There was even substantial evidence that he raped her. (See § 300, subd. (d), incorporating Pen. Code, § 11165.1.) And it is undisputed that F. was a member of her household at the time. It necessarily follows that allegation d-1 was true and that there was jurisdiction under subdivision (d). This is true without regard to whether the parents failed to protect G., or whether there was a likelihood of recurrence.

Indeed, the mother *concedes* that sexual abuse by a member of the household is sufficient to establish jurisdiction under subdivision (d)[3] (although she goes on to argue,

---

[3]     Specifically, she says: "[T]o establish jurisdiction under section 300, subdivision (d), a social services agency must *either* establish: (1) the child was sexually

15

contrary to her concession, that there was insufficient evidence that she failed to protect G. from sexual abuse).

Admittedly, the father makes no similar concession. To the contrary, he asserts: "Jurisdiction under subdivision (d), for sexual abuse by a member of the child's household requires a finding that the parent failed to adequately protect the child from sexual abuse when the parent knew or reasonably should have known the child was in danger of sexual abuse." However, he cites no authority for this proposition other than subdivision (d) itself. As discussed, subdivision (d) is expressly disjunctive.

Separately and alternatively, even assuming jurisdiction did additionally require a failure to protect from sexual abuse, there was substantial evidence of this.

It was undisputed that when G. was nine, she told the mother that F. had sexually abused her. G. later described the sexual abuse as oral copulation and touching of her thighs, buttocks and breast and said these occurred more than once.

According to the mother, at that point, G. merely told her that F. "would have her sit on his lap, . . . would touch her stomach when she was ill, and . . . would kiss her on the lips . . . ." She claimed G. did not disclose any more details until November 2021, and even then, G. said only that F. kissed her on the lips, hugged her too tightly, and danced with her. However, because G. said that, when she was nine, "she told her

---

abused . . . by her parent, her guardian, or a member of her household; *or* (2) a substantial risk the child will be sexually abused; *or* (3) the child's parent failed to adequately protect her from sexual abuse — or a risk of such abuse — when the parent knew or reasonably should have known the child was in danger of sexual abuse." (Italics added.)

16

mother," it is inferable that she disclosed the full extent of the sexual abuse. Moreover, G. also said that, "a few years ago" — i.e., well before November 2021 — she and her mother together made a disclosure to R. R. agreed that, two or three years earlier, the mother and G. told her that F. "had touched and kissed G[.] on the chest and private area." Thus, the mother became aware of sexual battery and oral copulation.

The mother did virtually nothing to protect G. According to G., she merely "yelled at" F. According to the mother, she told F. not to hug G., kiss G., or have G. sit on his lap. This did not rule out oral copulation or more serious sexual touching. And the mother had no apparent way to enforce these rules. She did nothing to prevent G. from being alone with F. She did not move the family out of F.'s house nor try to make F. move out. She did even not tell the father, and she did not tell R. for years; thus, they were not alerted to protect G. She also did not report the sexual abuse to the police. Admittedly, G. later said she did not want to live apart from F. and she did not want F. to be prosecuted. However, there is no evidence that she said this when she first disclosed. In any event, the juvenile court could conclude that, regardless of G.'s wishes, the parents could not protect her adequately without taking at least some of these steps.

The mother did testify that, after the disclosure that she dated to November 2021, "we did not leave [G.] alone"; G. was always with the mother, the father, or, when they were both at work, with R. The juvenile court, however, did not have to believe this. The mother would have had to explain this arrangement to the father; however, he claimed he was unaware of the sexual abuse. Moreover, the mother never told the social

17

worker about this arrangement. When the social worker asked her to agree to a safety plan that called for G. not be left alone, she did not say, "Oh, we're already doing that." She brought it up for the first time at the jurisdictional/dispositional hearing.[4]

G. told both the rape crisis hotline and the social worker that she had "recently" disclosed the sexual abuse to both the mother and the father. The father, however, like the mother, did nothing to protect G. When the social worker interviewed him, he claimed he had not known anything about the sexual abuse until the police told him. The juvenile court was entitled to conclude that this was false.

The parents cite *In re Savannah M.* (2005) 131 Cal.App.4th 1387 (*Savannah M.*), overruled on other grounds in *In re R.T.*, *supra*, 3 Cal.5th at pp. 626-633. However, *Savannah M.* involved subdivision (b); therefore, it held that there had to be evidence of a current risk. (*Id*. at p. 1394.) There, the child had been molested by a babysitter (i.e., not by a member of the household); when the parents discovered the molestation, they threw the babysitter out of the house and called police. (*Id*. at pp. 1390-1391.) The court concluded that there was insufficient evidence of a substantial risk of future serious physical harm. (*Id*. at p. 1396.)

---

[4] In her reply brief, the mother indicates that she took protective actions — i.e., putting a lock on G.'s door and making sure G. was never alone with F. — starting when G. first disclosed at age nine. She argues that this was adequately protective, because F. did not sexually abuse G. thereafter. However, in the proceedings below, she did not claim that she took those actions until November 2021.

*Savannah M.* is irrelevant here, because (1) we are considering sexual abuse by a member of the household under subdivision (d), which requires neither failure to protect nor a current risk, and (2) even if it does require failure to protect, the parents here did not take prompt or effective action upon learning of the sexual abuse.

We conclude that there was sufficient evidence to support the d-1 and d-2 allegations. We therefore need not decide whether there was sufficient evidence to support the b-1 and b-2 allegations.

C.     *The b-3 Allegation.*

The b-3 allegation stated that "the parents ha[ve] failed to maintain mental health services for the child to address the child's sexual abuse, anxiety, emet[o]phobia, self-harming, and history of thoughts of suicide."

The parents contend that, even if this was true, it did not show a substantial risk of serious *physical* harm, as subdivision (b)(1) would require.

We disagree. G. had a history of suicidal ideation and self-harm. Admittedly, she denied having such impulses as of February 2022. Nevertheless, the juvenile court could reason that, in light of her chronic anxiety, plus the inferably increasing distress that caused her to reach out to the hotline, there was a substantial risk that they would recur.

In addition, G. had suffered from emetophobia since she was nine. Emetophobia can cause a sufferer to be afraid of eating certain foods and/or under certain conditions. (Quinlan, Emetophobia vs. Eating Disorders (2023) <https://adaa.org/learn-from-us/from-the-experts/blog-posts/consumer/emetophobia-vs-eating-disorders>, as of Apr.

19

25, 2023.) In fact, emetophobia is often misdiagnosed as anorexia nervosa or bulimia nervosa. (D. Roy, *Emetophobia* (*a Specific Phobia of Vomiting*)*: A Case Study*, European Psychiatry (April 2017), abstract available at <https://www.sciencedirect.com/science/article/abs/pii/ S0924933817303826>, as of Apr. 25, 2023.) Here, we know that G.'s emetophobia had in fact manifested, at least once, in anorexia and malnutrition, requiring hospitalization. Again, the juvenile court could reason that there was a substantial risk that her ongoing emetophobia would cause serious physical harm.

IV

DISPOSITION

The orders appealed from are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

CODRINGTON
J.

20